of action is in the trustee of the estate and not in the beneficiaries; and also that there is a defect of parties defendant, in that Nestell is not a party to the action.

MILLER, J., concurs.

(66 Misc. Rep. 243.)

CARRIZZO v. NEW YORK, S. & W. R. CO.

(Supreme Court, Trial Term, Kings County.   February, 1910.)

1. CARRIERS (§ 100*)—CARRIAGE OF GOODS—DUTY TO DELIVER.
   The primary duty of a railroad company in carrying goods includes delivery of the goods to the consignee at destination, and the carrier is not entitled to an additional charge for car service until such duty is performed.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 427–433; Dec. Dig. § 100.*]

2. CARRIERS (§ 88*)—CARRIAGE OF GOODS—"CONSTRUCTIVE DELIVERY."
   Where goods were given to a railroad company for delivery to a consignee at a place where the company had no facilities for unloading cars or storing goods, and the company provided no facilities to the consignee for unloading cars except the consignee's own siding, the detaching of cars from trains and placing them on a side storage track between stations, where the consignee could not obtain access to them, for purposes of unloading, followed by notice to the consignee of their arrival, was not "constructive delivery," so as to put the consignee in default and entitle the carrier to demurrage.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 280–289½, 319–321; Dec. Dig. § 88.*
   For other definitions, see Words and Phrases, vol. 2, pp. 1469, 1470; vol. 8, p. 7613.]

3. CARRIERS (§ 100*)—CONTRACT OF SHIPMENT—DEMURRAGE.
   A bill of lading, providing that the carrier may charge for detention of cars after they have been held 48 hours for unloading, and may hold the property subject to a lien therefor, merely authorizes the carrier to charge demurrage when the cars have been held for unloading, and not to give such right where they have been placed upon a storage track awaiting switching to a place where they could be unloaded.
   [Ed. Note.—For other cases, see Carriers, Cent Dig. §§ 427–433; Dec. Dig. § 100.*]

4. CARRIERS (§ 100*)—CARRIAGE OF GOODS—DEMURRAGE—LIEN.
   A statement in a bill of lading that, where cars are detached from trains on private sidings, the goods shall be at the owner's risk, did not provide a lien for demurrage.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 433; Dec. Dig. § 100.*]

5. CARRIERS (§ 100*)—DEMURRAGE—LIEN
   In the absence of a provision in a bill of lading declaring a lien for delays before reaching private sidings, a carrier of freight cannot base a lien for demurrage on provisions for constructive placing of cars contained in schedules filed with the Interstate Commerce Commission.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 423; Dec. Dig. § 100.*]

6. CARRIERS (§ 89*)—REFUSAL OF CONSIGNEE TO ACCEPT GOODS—DUTY OF CARRIER TO NOTIFY SHIPPER.
   If the consignee of goods refuses to accept them, the carrier must promptly notify the shipper of such fact; and if perishable goods are

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not delivered, but held by the carrier, claiming a lien thereon, until they deteriorate without notifying the shipper, the carrier will be liable for damages sustained by the shipper from the delay.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 324–330; Dec. Dig. § 89.*]

Action by George Carrizzo against the New York, Susquehanna & Western Railroad Company. On motion to set aside a verdict for plaintiff. Denied, with directions.

Palmieri & Wechsler, for plaintiff.
Stetson, Jennings & Russell, for defendant.

PUTNAM, J. The matters here in controversy arose at Bogota, a small station on the line of the defendant's railroad in New Jersey. Among the industrial plants there is the Traders' Paper Board Company, which in 1908 was being operated by the Chancery Court of New Jersey, through Mr. Charles W. Bell, as receiver.

At Bogota there are three other manufacturing concerns which have private sidings connecting with the defendant's tracks. The railroad had only a small freighthouse, 14 by 14 feet, for local town freight, such as groceries and provisions, of insignificant volume. The defendant had no public track for the unloading of freight cars into vehicles, and made it a practice to accept car-load lots only, if consigned to one of the four firms which had private sidings where the cars could be received and unloaded on the property of such consignee. The railroad did not provide any means to unload its car-load lots before they reached these private sidings. It simply left the cars standing on side storage tracks, extending to the south from Bogota and nearly down to the next station below, Ridgefield Park. These sidings were not accessible to any consignee by vehicles, so that while on these tracks the freight cars could not be unloaded.

The Traders' Paper Board Company had been regularly receiving car loads of waste paper and other materials carried by the defendant. It received notices almost daily of the cars that had been entered in the yard book as arrived, which cars at the time might be standing along the storage tracks at points within 3,000 or 4,000 feet south of Bogota station. When the consignee was thus notified, he did not interfere with any particular cars, but left it to the railroad company to take out and place the cars on the consignee's private siding in the order in which the cars had been entered in the yard book as having arrived at the station. The sending of these cars into the siding and the removal of these there unloaded were by a switch engine and crew of the railroad, making two "drills" a day, at 8 a. m. and at 2 p. m. The unloading of cars containing paper was alongside the Traders' Company's platform, which had a capacity of about 11 cars, with further trackage for coal cars.

After Mr. Bell had assumed the duties of receiver, he declined to recognize any liability for claims for car service, or car detention, or car demurrage, before the cars were placed within his reach upon the private siding of the Traders' Company. His objection was apparently that, before the cars were thus placed on the consignee's

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

siding, the consignee was unable to reach them to unload; also, that the switching and sending of the cars to and upon his siding, and the removal of the empty cars therefrom, had been the subject of his repeated complaints to the railroad company. These disputed claims for car service are said to be in litigation in the New Jersey Chancery Court, which, however, had reached no adjudication of these points at the time of this trial.

In this state of affairs, Mr. Bell, as receiver, on October 14, 1908, contracted for the purchase of a large quantity of pressed paper from the plaintiff, a Brooklyn merchant, upon the terms that the plaintiff undertook the delivery by railroad to the Traders' paper mill at Bogota. These bales were picked up by the railroad lighters from different points along the North river in New York, whence they were made up into car loads at Jersey City. Although the bill of lading described the shipment as from Long Dock, Jersey City, to Bogota, the original deliveries having started in New York made the transportation interstate commerce. The following conditions were on the back of the bill of lading:

"Sec. 5. Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot, or place of delivery of the carrier, or warehouse, subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only, or may be, at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage.

"The carrier may make a reasonable charge for the detention of any vessel or car, or for the use of tracks after the car has been held forty-eight hours (exclusive of legal holidays), for loading or unloading, and may add such charge to all other charges hereunder and hold such property subject to a lien therefor. Nothing in this section shall be construed as lessening the time allowed by law or as setting aside any local rule affecting car service or storage.

"Property destined to or taken from a station, wharf, or landing at which there is no regularly appointed agent shall be entirely at risk of owner after unloading from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or other sidings, wharves, or landings shall be at owner's risk until the cars are attached to and after they are detached from trains."

These shipments were made on November 5th and 6th, followed by two car loads ordered direct from Piermont on November 11th. On the 13th of November, at 7 a. m., eight cars were on the defendant's side tracks, followed by the other three cars which came on November 16th, and notice of such arrivals was given to the consignee. On November 19th, while these cars remained on these sidings, a demand was made on the consignee for car service charges from the expiration of 48 hours' time after the cars had arrived. These claims for car service were $1 per car per day after the expiration of the free time, in accordance with the schedules for car demurrage filed with the Interstate Commerce Commission.

It was claimed that the defendant, by its engine and switching crew, had kept the consignee's private siding filled to its capacity with freight and coal cars which had arrived before the 11 cars here in controversy.

The testimony on behalf of the plaintiff indicated that these car deliveries at times had been delayed by the railroad. An illustration of this appeared in the record of cars on the morning of November 14th, the day after the arrival of the first eight cars. At 7 a. m., the railroad yard book showed only 7 loaded cars and 2 empty box cars on the siding of the Traders' Company, although its platform and track had a capacity for 11 such cars—a deficiency which the station agent was unable to explain. Later, the consignee informed the railroad officials that the shipper, and not Mr. Bell, was still the owner; but no notification was sent to the shipper. In January, the shipper began to make inquiries, and on January 22d, these 11 cars, still holding the plaintiff's goods, were sent to the railroad company's yards at Edgewater, where they were unloaded and the goods stored. It was proved, without contradiction, that pressed paper in bales rapidly deteriorated, so that, in January, two months after the shipment, this paper would be unfit for manufacture. Mr. Carrizzo, the shipper, then brought this suit against the railroad company for its breach of contract in not returning him the goods, as demanded.

Although the law of New York does not recognize any lien for detention of cars not unloaded at destination (Crommelin v. New York & Harlem R. Co., *43 N. Y. 90, affirming 10 Bosw. 77), following the English common law as to carriage by ships, the provision on the back of this bill of lading was considered as expressly giving a lien for car detention, in analogy to like provisions in charter parties. Carver, Carriage by Sea, § 659.

The court submitted to the jury: (1) That the cars must be in a reasonably accessible place where they can be unloaded and the goods removed; (2) whether the omission to have these cars on the consignee's siding was attributable to any act, default, or failure on the part of the consignee; and charged (3) that within a reasonable time after the demand and refusal to pay car demurrage it was the duty of the railroad to notify the shipper so that he might take action for the protection of his goods.

The court also charged:

"That the 11 car loads in question were delivered to and received by the New York, Susquehanna & Western Railroad Company subject to the terms and conditions of the bills of lading in evidence, and the plaintiff is bound by the said bills of lading and every part of them."

And:

"That under the terms of said bills of lading the defendant had a lien for demurrage charges, and had a right to retain the property until after the payment of such demurrage charges as had accrued, provided the opportunity to unload the cars had been afforded to the consignee."

The jury, having found for the plaintiff, defendant's counsel moved to set aside the verdict.

1. The chief question is whether the detaching of these cars from the freight trains and placing them on this side track between Bogota and Ridgefield Park, followed by notice to the consignee, was a constructive delivery so as to put the consignee in default and entitle the carrier to claim car demurrage. Actually, there was not a legal de-

livery, because the cars had not reached their final destination, and still required the intervention of the switching engine and crew.   N. Y. Central & H. R. R. R. Co. v. Davis, 86 Hun, 86, 90, 34 N. Y. Supp. 206.   The rate of freight on these goods included a carriage of the goods to Bogota and a delivery there to the consignee.   This is the primary duty of the carrier.   Car service charges are based on something superadded—some additional benefit given to the consignee. This appears in a decision by the Interstate Commerce Commission, where they declare:

"The purpose of a demurrage charge and charges of a kindred nature is twofold.  In the first place, they are imposed as compensation to the carrier for an additional service.  The rate of freight includes a delivery of the property; it does not include the storage of the property after reasonable opportunity has been afforded the consignee to receive it.  When, therefore, the carrier through failure of the consignee to promptly remove the property is obliged to store the same either in its cars or its warehouses, it performs a service not embraced in the rate, and for which additional compensation may properly be exacted."   N. Y. Hay Exch. Ass'n v. Penn. R. Co., 14 Interst. Com. R. 178, 184.

Such charges are allowed when they follow full performance of the carrier's contract.   Judge Lowell said:

"Practically all the charges here in question are made to compensate the railroad for the use of its cars and tracks beyond that reasonable period during which a railroad must allow the consignee to come and get his goods without charge."   Michie v. N. Y. & N. H. R. Co. (C. C.) 151 Fed. 694, 696.

In the situation at Bogota, there was no opportunity to reach these cars; and yet it is claimed that the consignee was in default for not removing the goods from a car placed on an inaccessible track.

The primary duty of a carrier to give the consignee an opportunity to get his goods should not be evaded because the carrier fails to provide proper track facilities.   In Schumacher v. C. & N. W. R. Co., 207 Ill. 199, 209, 69 N. E. 825, the court lays stress upon this essential. The opinion is careful to point out:

"After it had lain there 24 hours, and said car was placed where appellant had full and fair opportunity to remove the freight without interference in any form and to approach the car from both sides for that purpose, and when appellee's duty as a common carrier had ceased, appellant was notified that he must remove the same within 48 hours."

In the Georgia rules for car demurrage, approved by the court, it was accordingly stipulated:

"It being understood that said car or cars are to be placed and remain accessible to the consignee for the purpose of unloading during the period in which held free of demurrage and that when the period for such demurrage commences they are to remain accessible to the consignee for unloading purposes."   Miller v. Georgia R. R. & Banking Co., 88 Ga. 563, 15 S. E. 316, 18 L. R. A. 323, 30 Am. St. Rep. 170.

In the light of these authorities, the bill of lading condition, giving the right of car demurrage, becomes clear.   "The carrier may make a reasonable charge for the detention of any vessel or car, or for the use of tracks, after the car has been held 48 hours (exclusive of legal holidays) for loading and unloading, and may add such charge to all other charges hereunder, and hold such property subject

to a lien therefor." This authorizes the carrier to claim demurrage only when he has held the cars for unloading—not while awaiting switching to reach a place where the unloading can begin.

The rule might be different in those states that recognize a carrier's lien for car detention. In New York, no such lien exists, unless by special agreement. Hence the terms of such agreement are not to be extended. The lien is contracted for only after 48 hours in which the car is held for unloading.

The contrary view would be open to grave injustice. The carrier can control its traffic at its will. In the present case, several days intervened between the shipment and its arrival. If the carrier wished to release its cars promptly, it had only to provide the ordinary facility of a track alongside an accessible place, whereupon, after notice, the free time would begin to run, as the cars would then be available to the consignee to perform his undertaking to unload his merchandise. The maritime analogies follow a similar principle. Thus, where a vessel is to discharge at a specified dock, her lay days for discharging do not begin to run till she is actually alongside such dock in condition to discharge. Dahl v. Nelson, L. R. (6 App. Cas.) 38, 44; Murphy v. Coffin, 12 Q. B. Div. 87; The Ionia, 135 Fed. 317, 67 C. C. A. 671.

It is contended that the provisions for notification in the defendant's schedules filed with the Interstate Commerce Commission provide for "constructive placing." Likewise, the bill of lading states that, in case of private sidings, the goods shall be at owner's risk after the cars "are detached from trains." Whatever may be the force of these provisions, they do not attempt to confer any lien which is given only after 48 hours to remove the goods, or to unload the car.

It was argued that the carrier's general obligation was changed when car-load lots were accepted only for the consignees having private sidings. While this may be true, that fact did not confer on the railroad a lien for car demurrage, unless it had fulfilled all the conditions of the contract on the part of the carrier, or had been prevented from doing so by the act of the consignee—for instance, if, in those circumstances, the consignee unduly interfered with the switching of the cars to the sidings, or if it refused reasonably to increase its sidings to accommodate the growing traffic ordered to that place. But it here appeared that the consignee had asked for better "drill" service, and had even offered the railroad the requisite land for additional tracks at the mill; and, instead of interfering with the regular order of delivery of cars (that is, by picking out certain cars to come on the siding out of turn), had abstained from any interference with the placing of the cars, leaving the railroad at liberty to follow the regular order in which the arrival of the cars had been entered in the yard books.

In railroad transportation, as in maritime traffic, the right to demurrage must clearly be shown by defaults on the part of the person charged, which defaults must arise from the failure to use proper diligence, or to carry out an agreement for unloading in a specified time. In the absence of any provision in the bill of lading declaring a lien for delays before reaching private sidings, the carrier (at least in New

York) cannot found such a lien for demurrage on clauses providing for the constructive placing of the cars contained in schedules filed in a public office, particularly when, as in this case, such constructive placing is at a point found to be inaccessible for unloading.

2. Furthermore, there was a clear issue here whether this delay in bringing the cars to a position for unloading was by causes attributable to the consignee. It was not explained how these first 8 cars were so long going less than 20 miles from Jersey City. The daily yard records, taken at 7 a. m. at Bogota, showed on several days less than the full complement of paper cars on the consignee's siding. This raised an issue for the jury.

3. Even if the defendant's position toward the consignee was justified, it was bound to notify the shipper that his shipments had been refused.

In 1905, the Interstate Commerce Commission declared this duty with regard to hay shipments. In a case of car demurrage Commissioner Prouty, delivering the opinion of the Commission, said:

"We do think that some method should be provided by which shippers of hay like the complainants will be promptly notified by the carrier of the refusal of a consignee to accept and unload the shipment." Kehoe Co. v. Charleston & W. C. R. Co., 11 Interst. Com. R. 166, 171.

Accordingly, the defendant's schedules expressly provided that, where cars will not be released in the free time, or car demurrage will not be paid, "consignors shall be promptly notified." This is a general requirement when asserting a carrier's lien over property which the consignee disclaims and refuses to accept. Manhattan Shoe Co. v. C., B. & Q. R. Co., 9 App. Div. 172, 41 N. Y. Supp. 83; Hudson v. Baxendale, 2 Hurl. & N. 574; Louisville & Nash. R. Co. v. Duncan, 137 Ala. 446, 34 South. 988; Mich. Cent. R. Co. v. Harville, 136 Ill. App. 243. The fact that Mr. Bell had steadily declined to admit such demurrage claims made it evident, even before formal demand, that these claims would not be paid, and, therefore, called for prompt notice to plaintiff.

In the case at bar, the failure to notify the plaintiff was serious. Paper waste carries moisture. After being pressed in bales, the fiber will rot if it is not manufactured within 30 days. To the extent that these car loads were perishable, the obligation to notify the plaintiff became more stringent. Apparently, it was entirely lost sight of. Plaintiff did not learn the situation until after he had caused a "tracer" to be put in at the Jersey City railroad office to search for his merchandise. This was after January 9th. The jury were justified in finding that this notice was not given within a reasonable time, in view of the attitude of the consignee, the short distance, and the ready means of communication.

It follows that the defendant did not interpose a good defense as against the shipper; and the motion to set aside the verdict is denied, with direction to enter judgment upon the verdict, with costs and 5 per cent. allowance.

Ordered accordingly.