HARRY E. ROSS et al.

*vs.*

MAINE CENTRAL RAILROAD COMPANY.

Penobscot.    Opinion June 4, 1914.

*Carmack Amendment.    Continuous Carriage.    Initial Carrier.    Negligence.*
*Notice of Loss.    Through Bills of Lading.    Terminal Carrier.*
*24 United States Statutes at Large, page 379.*

Potatoes were shipped from a station on the line of the Bangor Railway and Electric Company, an electric railroad corporation, consigned to the shipper's order at Bangor.  They were intended by the shipper for through and continuous transportation to Hoboken, New Jersey.  At Bangor the cars were received by the defendant and forwarded.  There was a through tariff rate from the point of shipment to Hoboken, and when the defendant received the cars it advanced to the Bangor Railway & Electric Company its proportion of the through tariff rate.  The defendant issued through bills of lading to Hoboken and collected of the shipper "heater charges" which were intended to cover heating the cars from Bangor to Hoboken.  The potatoes were frozen while in transit, but not on the defendant's line.

*Held:*

1.  That the receipt by the Bangor Railway and Electric Company of its proportion of the through tariff charges is some evidence of "a common control, management or arrangement for a continuous carriage or shipment" as defined in 24 U. S. Statutes at Large, p. 379, so as to bring that corporation within the scope of the Act to regulate commerce as amended by the Carmack Amendment, and make it liable, as initial carrier, for the defaults of connecting carriers.

2.  But that the defendant, having assumed the obligation of heating after the potatoes had left the possession of the Bangor Railway and Electric Company, is to be deemed the initial carrier as to defaults in heating during the course of transportation.

3.  That the case shows sufficient evidence to go to the jury on the question of damages.

4.  That, as to the question of failure to give notice of the loss either to the initial or terminal carrier within ninety days, as required by the bills of lading, the point not having been made in the motion for a nonsuit, when the lack of evidence might have been supplied, it is not considered by the court.

On exceptions by plaintiff.   Exceptions sustained.

This is an action on the case to recover for damages by freezing of potatoes shipped by a Maine Central bill of lading from Bangor, Maine, over the line of the Maine Central Railroad and connecting carriers to Hoboken, New Jersey.   They were shipped from a station on the line of the Bangor Railway and Electric Company, consigned to the shipper's order at Bangor, and intended by the shipper for through and continuous transportation to Hoboken, New Jersey. The potatoes were frozen while in transit, but not on the defendant's line.   Plea, general issue.   At the close of the evidence for the plaintiff, the presiding Justice directed a nonsuit, to which direction the plaintiff excepted.

The case is stated in the opinion.

*Terence B. Towle, and Charles J. Hutchings,* for plaintiffs.

*Fellows & Fellows,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, KING, HALEY, HANSON, JJ.

SAVAGE, C. J.   Action of assumpsit against the defendant, as a common carrier, for damages to three car loads of potatoes, caused by freezing.   The plaintiffs in their declaration allege in substance that they delivered the potatoes to the defendant to be carried and forwarded by it from Bangor to Hoboken, New Jersey, and that the defendant, in consideration of a certain sum of money paid to it by the plaintiffs, promised "to keep the cars heated and warmed until said cars should reach their destination, so that said potatoes would not freeze or be injured while in transit, but that the defendant did not regard its promise, and failed and neglected to keep the cars properly heated and warmed, so that the potatoes were thereby chilled and frozen."

The case shows that the potatoes were loaded in cars at different stations on the line of the Bangor Railway and Electric Company, a corporation operating an electric railroad between Charleston and Bangor, all in the county of Penobscot, and being physically connected by switch and siding with the Maine Central Railroad at Bangor, and of the same gauge.   This railroad does a freight business.   It takes freight cars from the Maine Central, uses them for purposes of transportation along its line, and returns them.   The cars that are involved in this controversy were so taken.   One of them was an

ordinary Eastman Heater car, and the other two are called in the case "Maine Central Eastman Heater" cars. The Bangor Railway and Electric Company hauled the cars, after they were loaded, to Bangor and delivered them to the defendant. The defendant carried them over its line, and caused them to be forwarded to Hoboken, in the same cars, without transshipment. When they reached Hoboken, some of the potatoes were frozen.

The Bangor Railway and Electric Company issued bills of lading for two of the cars, in which it appeared that the potatoes were consigned to the consignor's order, and that their destination was Bangor. There was, so far as the case shows, no bill of lading for the third car. When the potatoes were delivered to the Bangor Railway and Electric Company, the shippers intended a through and continuous shipment to Hoboken, but there is no evidence that the responsible shipping agents of that company knew that the destination was beyond Bangor. But it appears that there was a through tariff rate from the points of shipment on the Bangor Railway and Electric Company's line to Hoboken, and that the defendant when it received the cars at Bangor advanced to that company its proportion of the through freight charges.

When the defendant received the cars, it issued to the plaintiffs through bills of lading to Hoboken. The cars were routed over its own line, the Boston & Maine Railroad, and the Delaware, Lackawanna & Western Railroad, the last company being the terminal carrier. The defendant also collected of the plaintiffs at Bangor "Heater charges" and gave a receipt therefor, and there is no question but that these "charges" were to cover heating the cars from Bangor to Hoboken. There was no reference to heating in the bills of lading. There is no evidence that the potatoes were injured while in transit over the defendant's line. One of the conditions in the bills of lading issued by the defendant was that "claim for loss, damage or delay must be made in writing to the carrier at the point of delivery or at the point of origin within four months after delivery of the property, or, in case of failure to make delivery, then within four months after a reasonable time for delivery has elapsed. Unless claims are so made, the carrier shall not be liable." There is no evidence that the notice required was seasonably given, either to the initial or to the terminal carrier. But it appears that the plaintiffs first brought suit against the Eastman Heater Car Company. What has become of that suit does not appear.

Upon this state of facts, the presiding Justice ordered a nonsuit, to which order the plaintiff alleged exceptions.

The plaintiffs contend in the first place that the defendant was the initial carrier, and, as such, is liable for any loss, damage, or injury in interstate shipments caused by connecting carriers, by virtue of the amendment of June 29, 1906, known as the Carmack Amendment to the Interstate Commerce Act of February 24, 1887, U. S. Compiled Statutes, Supplement 1909, page 1166. The defendant on the other hand contends that the shipment was a through interstate shipment at a through rate, and that the Bangor Railway and Electric Company was the initial carrier, and hence that it is not itself liable, in the absence of proof of any default on its own line. Although the Bangor Railway and Electric Company did not issue through bills of lading, but issued such bills only over its own line, the fact that the defendant advanced to it its proportionate part of the through tariff rates, is some evidence of a "common control, management or arrangement for a continuous carriage or shipment" as defined by section 1 of the act to regulate commerce, 24 U. S. Stat. at Large, page 379, and therefore we think that the Bangor Railway and Electric Company was as to these shipments originally, within the scope of the act to regulate commerce as amended by the Carmack Amendment, and as initial carrier was liable for the defaults of connecting carriers. *United States* v. *Seaboard Ry. Co.,* 82 Fed. Rep., 563; *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.,* 118 Fed. Rep., 613.

But the Bangor Railway and Electric Company entered into no express engagement or undertaking to keep the cars heated, either upon its own line, or beyond, and we think none was implied. The receipt by the defendant of full through heater charges, and the receipt therefor given by it, upon a shipment from "Bangor to Hoboken" do import we think an undertaking on its part to keep the cars heated properly to the point of destination. Congress has by the Carmack Amendment declared in substance "that the act of receiving property for transportation to a point in another State and beyond the line of the receiving carrier shall impose on such receiving carrier the obligation of through transportation with carrier liability throughout." *Atlantic Coast Line* v. *Riverside Mills,* 219 U. S., at page 198. In the same case it is also said that under the Carmack Amendment a receiving carrier, when it receives

property in one State to be transported to a point in another, involving the use of a connecting carrier for some part of the way, shall be deemed "to have adopted such other carrier as its agent, and to incur carrier liability throughout the entire route, with the right of reimbursement for a loss not due to its own negligence."

Assuming now that the Bangor Railway and Electric Company was the original initial carrier, is it liable as such under the Carmack Amendment for failure to perform a special agreement made by a subsequent and connecting carrier? or may the defendant be deemed to be the initial carrier, as to the obligation to heat? or is the defendant liable upon its own special undertaking? It is upon the last suggested theory that the plaintiffs have framed their declaration. And as to this, it may be said that while it is the rule in this State that a carrier is not liable for goods shipped beyond the end of its route, unless there is a special undertaking for through shipment, *Skinner* v. *Hall,* 60 Maine, 477; *Grindle* v. *Eastern Express Co.,* 67 Maine, 317, yet it is well settled that a carrier may make such a special agreement and be liable if it be not performed. It may be said also that the Carmack Amendment itself provides that the holder of a bill of lading is not deprived by that act "of any remedy or right of action he has under existing law."

If the Bangor Railway and Electric Company was under no obligation under its general bill of lading to heat the cars, and we think it was not, it is difficult to perceive upon what ground it can be held liable for the non-performance of a special agreement to heat, made by a connecting carrier. We think such a responsibility is not contemplated by the Carmack Amendment. The agreement to heat made by the defendant was incidental to its general duty as a carrier under the bills of lading issued by it, and must be construed with them. The defendant was the first carrier to contract with the shipper with respect to heating. And we think that as to defaults in heating during the course of transportation, it is to be deemed the initial carrier. We may properly add that the point seems to be a novel one in cases involving a construction of the Carmack Amendment. Our attention has been called to no case, and we have found none, like this one. We base our conclusion upon what seems to us to be a reasonable construction of the statute.

One or two other questions remain to be considered. In moving for a nonsuit, the defendant contended, as another ground for non-

suit, that the plaintiff had failed to show the value of the potatoes at the place of shipment, the bill of lading specifying that the amount of loss or damage shall be computed on the basis of the property at the place and time of shipment. We think there was sufficient evidence on this question to go to the jury.

The defendant now contends that the order of nonsuit should not be disturbed, because there was no evidence that any claim for loss or damage was made to the initial or to the terminal carrier within four months, as stipulated in the bill of lading, as a condition to the right to recover, and cites many cases to the effect that such a stipulation is a reasonable and valid one.

But this defense was not pleaded, as some courts have held that it must be, to make it available, nor was the point stated at the trial, by either counsel or court. We think we have no occasion now to decide whether the stipulation as to giving notice is such a condition precedent to a right of action that when there is a failure to give notice the plaintiff in his declaration must allege and excuse it, or whether the defendant must plead it, by way of brief statement. The authorities do not agree upon either of the propositions. For we do think that the defendant having stated other objections, but not having stated this one at a time when the lack of proof of notice, if notice was given, could have been supplied, should be deemed to have waived it.

Holding, as we do, that the defendant was the initial carrier, with respect to the defaults complained of, it follows that it was error to direct a nonsuit.

*Exceptions sustained.*