of insurance impaired the obligation of the contract defendant made, and was consequently invalid and void, as being in violation of the vested contract rights of plaintiff. The relief asked seems to be well within the jurisdiction of a court of equity. Langan v. American Legion of Honor, 174 N. Y. 267, 66 N. E. 932. A decree should, therefore, be made in favor of plaintiff, granting him such relief, together with costs.

Findings may be prepared in accordance with this opinion, and, if not assented to by counsel, settled before me on five days' notice. The plaintiff's attorney will serve a copy of this opinion with the proposed findings.

Judgment accordingly.

---

WIEN v. NEW YORK CENT. & H. R. R. CO.   (No. 6919.)

(Supreme Court, Appellate Division, First Department.   March 12, 1915.)

1. CARRIERS ⬤⟹177—CONNECTING CARRIERS—LIABILITY OF INITIAL CARRIER—LOSS OR DAMAGE—INTERSTATE COMMERCE ACT.

Under the Carmack amendment to the Interstate Commerce Act (Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 593 [Comp. St. 1913, § 8592]), making initial carriers liable for any loss or damage caused by a connecting carrier, the initial carrier is liable, not only for the negligence of its own servants, but for those of connecting carriers, resulting in any loss or damage to the goods en route.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. ⬤⟹177.]

2. CARRIERS ⬤⟹177—CONNECTING CARRIERS—LIABILITY OF INITIAL CARRIER—DELIVERY TO CONSIGNEE—INTERSTATE COMMERCE ACT.

Under the Carmack amendment to the Interstate Commerce Act, the initial carrier is liable for any loss or damage resulting from the final carrier's failure to notify the consignee of the arrival of goods at destination, and for its failure, on the consignee's refusal to accept them, to store the goods for the account of the consignor, or to exercise proper care in holding them for him.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. ⬤⟹177.]

3. CARRIERS ⬤⟹89—DELIVERY OF GOODS—PRESUMPTION—CONSIGNOR AS OWNER.

Under the Carmack amendment to the Interstate Commerce Act, it is presumed, upon a shipment by bill of lading, without notation thereon or elsewhere with respect to notifying the consignor or any one of the consignee's refusal to accept, that the consignee is the owner.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 324–330; Dec. Dig. ⬤⟹89.]

4. CARRIERS ⬤⟹89—DELIVERY OF GOODS—LIABILITY.

The common-law liability of the carrier ends when the goods reach their destination, and the consignee has a reasonable time after notice to accept them, and fails to do so or refuses to accept them.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 324–330; Dec. Dig. ⬤⟹89.]

5. CARRIERS ⬤⟹140—DELIVERY OF GOODS—LIABILITY AS WAREHOUSEMAN.

Upon the consignee's failure to accept goods after notice and a reasonable time to remove them, the liability of the carrier as a warehouseman commences.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 609, 609½, 611–616; Dec. Dig. ⬤⟹140.]

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. CARRIERS ⊚⟹175—DELIVERY OF GOODS—CONSIGNEE'S REFUSAL TO ACCEPT
—NOTICE TO CONSIGNOR.

At common law a ·carrier is not bound to notify the consignor of the
consignee's refusal to accept the goods after notice and reasonable time
for removal, at least where the consignee appears presumptively to be
the owner, or unless in the circumstances of the particular case reasona-
ble care requires it; nor. does the Interstate Commerce Act expressly re-
quire such notice to the consignor, and thereunder the carrier's liability
is not beyond that imposed by the common law as construed by the federal
and state courts; and even if it was the duty of the final carrier to notify
the consignor of the consignee's refusal to accept, the initial carrier would
not be liable, where no damage resulted from its failure to do so.

⌊Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 764, 765; Dec.
Dig. ⊚⟹175.]

7. CARRIERS ⊚⟹89—CONSIGNEE'S REFUSAL TO ACCEPT—DUTY OF CONSIGNOR.

Where the consignee, after notice of arrival, refuses to accept goods,
the consignor is bound to demand delivery of the goods to himself and to
take charge of them at destination.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 324–330; Dec.
Dig. ⊚⟹89.]

8. CARRIERS ⊚⟹177—ACTION FOR NONDELIVERY—LIABILITY—"DAMAGE OR IN-
JURY"—"TRANSPORTATION."

Where a consignor, upon learning that his interstate shipment of goods
had not been accepted by the consignee and had not been delivered, di-
rected the initial carrier to have them returned at once, and then him-
self took the matter up with the final carrier, the initial carrier was not
liable for damages from the final carrier's failure to return them under
its agreement with the consignor; any "damage or injury" in such case
not being within Interstate Commerce Act, § 20, imposing liability on
initial carrier for damage or injury by connecting carrier, nor within
section 1 of that act·(Comp. St. 1913, § 8563), defining "transportation,"
as used in section 20, to include services in connection with the receipt,
delivery, and transfer in transit.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–
803; Dec. Dig. ⊚⟹177.

For other definitions, see Words and Phrases, First and Second Series,
Transport.]

Hotchkiss, J., dissenting.

Appeal from Appellate Term, First Department.

Action by Joseph Wien against the New York Central & Hudson
River Railroad Company. Judgment in the Municipal Court for de-
fendant was reversed by the Appellate Term (85 Misc. Rep. 42, 146
N. Y. Supp. 1010), and defendant appeals. Reversed, and judgment
of Municipal Court affirmed.

See, also, 163 App. Div. 945, 148 N. Y. Supp. 1150.

Argued before CLARKE, LAUGHLIN, SCOTT, DOWLING, and
HOTCHKISS, JJ.

William Mann, of New York City, for appellant.
Joseph Levy, of New York City, for respondent.

LAUGHLIN, J. As I view the case, it is unnecessary to decide
whether the defendant would have been liable for failing to procure
the return of the goods, if plaintiff had left the matter in its hands on
its agent's undertaking or promise. The decision of that question
would depend upon whether the negotiations constituted a new and
valid contract as a carrier for the transportation of the goods back

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to the point from which they had been shipped, or only a contract for forwarding them (see G. C. & S. Ry. Co. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540), or merely an agreement to transmit further shipping instructions to the final carrier for compliance with which it would not be liable as a carrier. Howatt v. Bennett, 156 App. Div. 849, 142 N. Y. Supp. 135. The plaintiff, after opening negotiations with the agent of the defendant for the return of the goods, acquiesced in the suggestion of the agent that he take the matter up with the agent in New York of the final carrier, on the ground that by so doing a return of the goods could be had a few days sooner than if the matter were left to the defendant to arrange. The testimony of the plaintiff with respect to his response to that suggestion is as follows:

"I said, 'Very well;' and I went to the Atchison, Topeka & Sante Fé Railway on Broadway, and saw Mr. Mills," and thereupon "opened the negotiations" with him as the agent of the final carrier, and made no report or further application to the defendant.

[1, 2] Under the Carmack amendment, so called, to the Interstate Commerce Act, the defendant would have been liable, not only for the negligent acts and omissions of its own employés, but for those of connecting carriers resulting in any loss or damage to the goods en route, and also for any loss or damage resulting from the failure of the final carrier to notify the consignee of the arrival of the goods at destination, and for its failure, on the consignee's refusing to accept them, to store the goods for the account of the shipper or to exercise proper care in holding them for him. Adams. Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; Kansas City Southern Rd. Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. Ed. 683; Galveston, H. & S. A. Ry. Co. v. Wallace, 223 U. S. 481, 32 Sup. Ct. 205, 56 L. Ed. 516; Atlantic Coast Line Rd. v. Riverside Mills, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7; Becker v. Pa. Rd. Co., 109 App. Div. 230, 96 N. Y. Supp. 1; Earnest v. D., L. & W. R. Co., 149 App. Div. 330, 134 N. Y. Supp. 323; Coovert v. Spokane, P. & S. Ry. Co., 80 Wash. 87, 141 Pac. 324; Norfolk & W. R. Co. v. Stuart Draft Co., 109 Va. 184, 63 S. E. 415.

[3] The goods were consigned to the People's Store at Coffeyville, Kan. There was no notation on the bill of lading or elsewhere with respect to notifying the shipper or any one else, and presumptively, therefore, the consignee was the owner, which distinguishes the case from Nashville, C. & St. L. Ry. Co. v. Dreyfuss, 150 Ky. 333, 150 S. W. 321, where the goods were consigned *to the order of the shipper* with directions to notify, at the place of destination, one Howe, who refused to accept them, and the initial carrier was held liable, on account of the failure of the final carrier to give it notice of the rejection of the consignment, for damages caused by fire while the goods remained in possession of the final carrier. The duty of notifying the consignor was predicated upon the ground that the bill of lading showed that it owned the goods.

[4-6] The general rule, well settled in this jurisdiction, is that the common-law liability of the carrier ends when the goods reach their

destination and the consignee has had a reasonable time, after notice, to accept them, and fails to do so, or refuses to accept them, and that thereupon the liability of the carrier as a warehouseman commences, and that no duty devolves upon the carrier, as matter of law, to notify the consignor, at least where the consignee appears presumptively to be the owner, of the refusal of the consignee to accept the goods, unless in the circumstances of the particular case reasonable care requires it. Weed v. Barney, 45 N. Y. 344, 6 Am. Rep. 96; Bacharach v. Lehigh Valley Rd., 143 App. Div. 117, 127 N. Y. Supp. 607; Manhattan Shoe Co. v. C., B. & Q. R. R. Co., 9 App. Div. 172, 41 N. Y. Supp. 83; Fenner v. Buffalo & St. L. R. R. Co., 44 N. Y. 505, 4 Am. Rep. 709.

In the case at bar it appears that the consignor had been notified by the consignee, before he shipped the goods, that they would not be accepted, and that they would be left at the railroad depot at destination. There is no express provision, at least, of the Interstate Commerce Act requiring notice to the consignor of the refusal of the consignee to accept the goods, and it was held in Adams Express Co. v. Croninger, supra, that the federal statutory liability, "aside from the responsibility for the default of a connecting carrier en route, is not beyond the liability imposed by the common law as that body of law applicable to carriers has been interpreted" by the federal courts as well as the courts of the states; and there is no decision of the federal courts, to which our attention has been drawn, or which we have been able to find, holding that such duty is imposed by the federal statute.

Assuming, however, for the purposes of the appeal, but without deciding the point, that it was the duty of the final carrier to notify the shipper of the refusal of the consignee to accept the consignment, and that the defendant would be liable for the failure of the final carrier to perform such duty, still the liability cannot be predicated on that ground here, for no damages are shown to have resulted therefrom, which is essential to warrant a recovery on the statutory liability. See Earnest v. D., L. & W. Rd. Co., supra. It appears that the consignee was duly notified and refused to accept the shipment, and that the goods were safely and properly stored or kept by the final carrier, and that the consignor was notified by the consignee that it had refused to accept the goods, and so informed the duly authorized agent in New York of the final carrier, and requested that the goods be returned in ample time, if the request had been honored, to avert any loss or damages in the premises.

[7] On the uncontroverted evidence the loss was due to the failure of the consignor to demand delivery of the goods to himself and to take charge of them at the point of destination, on the refusal of the consignee to accept them, as was his duty (see Norfolk & W. R. Co. v. Stuart Draft Co., supra), or to the failure of the final carrier, which was then acting as warehouseman, to comply with the instructions timely given by the consignor for the return of the goods to him. It may be that the defendant remained liable for the acts and omissions of the final carrier as warehouseman with respect to keeping the goods safely, and would have been liable for failure to deliver the goods to the consignor or to his order *at destination* on the failure of the con-

signee to accept them; but we are not called upon to decide that question now, for the reason that there is no evidence of the breach of any duty on the part of the final carrier, either with respect to storage, preservation, or delivery *at the point* of destination.

[8] The only arguable theory is that defendant is liable for its own failure, or the failure of the final carrier, to return the goods when requested. But the defendant was under no obligation, imposed by the common law, or arising from the bill of lading it issued, or by virtue of the federal statute, *to return* the goods in the event that the consignee refused to accept them. The obligation to return arose solely from the new contract negotiated after the consignee refused to accept the goods. The defendant cannot, in the circumstances, in my opinion, be held liable without so extending the liability of initial carriers as to render them responsible for failure of final carriers to perform any new contract negotiated between the shipper and them after the arrival of the goods at destination; and the theory on which the constitutionality of the law, in so far as it makes connecting carriers the agents of the initial carriers, has been sustained, does not, I think, so extend the construction as to make the connecting carriers the agents of the initial carriers in everything that they may do at any time with respect to the property, but only for the purpose of enabling the shipper to obtain redress from the initial carrier for any breach of the original contract of shipment regarded as a through contract. See Atlantic Coast Line v. Riverside Mills, supra. The only liability of the defendant was under the express and implied provisions of the bill of lading issued by it construed in the light of the Interstate Commerce Act; and it has not yet been held that such liability extends to a breach of duty, or to a contract arising under subsequent negotiation between the shipper and final carrier for the further transportation of the property, whether to the point of original destination or to another point. G., C. & S. Ry. Co. v. Texas, supra; Howatt v. Bennett, supra; Sheehy v. Wabash Rd. Co., 169 Mich. 604, 135 N. W. 655; Ross v. Maine Central R. R. Co., 112 Me. 711, 90 Atl. 711. See, also, Norfolk & W. R. Co. v. Stuart Draft Co., supra.

In Norfolk & W. R. Co. v. Stuart Draft Co., supra, decided by the Supreme Court of Appeals of Virginia in 1909, it was held, construing the Carmack amendment, that the liability of the initial carrier *ends* when the liability of the final carrier as a warehouseman *commences,* and that the initial carrier was not liable for damages resulting from the negligence of the final carrier while acting as a warehouseman after the refusal of the consignee to accept the goods; but that question is not now presented for decision, and we express no opinion thereon. In Coovert v. Spokane, P. & S. Ry. Co., supra, which was decided in 1914, it was held that the initial carrier was liable for a wrongful delivery by the final carrier to the consignee, without requiring the production of the bill of lading, after the consignee had returned the bill of lading to the consignor, at the same time notifying him that the goods would not be accepted, and after the consignor had surrendered the bill of lading to the initial carrier, which had agreed to have the goods returned, and had duly notified the final carrier to return them. But that

was a case of liability arising out of a *wrongful delivery*, which may be said to be within the express provisions of the federal statutes, as will be seen presently, and is not, I think, authority for the contention that the initial carrier is liable for *all* acts of negligence on the part of the final carrier while acting as warehouseman.

It is quite clear, I think, that there was no loss from "damage or injury" to the goods caused by the final carrier, within the provisions of section 20 of the Interstate Commerce Act, which imposes liability on the initial carrier for such damages; nor is the respondent aided by the definition in section 1 of the Interstate Commerce Act of the word "transportation" as used in section 20 thereof, whereby it is declared, among other things, that "transportation" includes "service in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigerating or icing, storage and handling of property transported." The plaintiff was aware that the consignment had not been delivered and that it was held by the railroad company in ample time for him to arrange, in the exercise of due diligence, to have it delivered to him at the point of destination, or returned to him before he would lose the benefit of his market or sustain any loss. There was no breach of the defendant's contract to transport the property and to tender the delivery thereof, and, in the event of the refusal of the consignee to accept it, to have it held or stored by the final carrier subject to the order of the shipper. There is no evidence that the market value of the goods had depreciated at the time plaintiff received notice that the consignee had refused to accept them, and that they were at the railroad depot and in possession of the final carrier, or for a long time thereafter.

I am unable to agree with Mr. Justice HOTCHKISS that the loss was caused by erroneous information with respect to delivery to the consignee, imparted by the agent of the final carrier, and I express no opinion with respect to the liability of defendant for such misinformation if damages resulted therefrom. As already observed, the damages resulted from the failure of the final carrier to return the property as requested by the shipper, who accepted the suggestion of the defendant's agent and took upon himself the negotiations with the agent of the final carrier for the return of the consignment, and for that breach of duty, which is the only theory on which liability could in any view of the case be predicated, the initial carrier is not responsible.

I am therefore of opinion that the learned Appellate Term erred in reversing the judgment of the Municipal Court, and its determination is reversed, with costs, and the judgment of the Municipal Court affirmed, with costs.

CLARKE, SCOTT, and DOWLING, JJ., concur.

HOTCHKISS, J. (dissenting). On February 8, 1912, plaintiff delivered to the defendant in this city a case of merchandise, consisting of dresses or gowns, and consigned to the People's Store at Coffeyville, Kan.; the shipment being routed over the Santa Fé Railroad. It was conceded on the trial that the goods arrived at their destination within

a reasonable time, that the consignee was promptly notified of their arrival, that the consignee in due time notified the agent of the Santa Fé that it refused to accept the shipment, and that notice of this fact was not given to plaintiff until as hereinafter stated.

On or about April 24th plaintiff received a letter from the consignee saying that it refused to accept the goods. On April 26th plaintiff showed this letter to defendant's agent in this city, and in reply to his query as to what he should do to get his goods back "by the next express" plaintiff was told to sign a return order. Having signed such an order, plaintiff was informed by the agent that defendant would have to communicate with its agent in Chicago, who in turn would take the matter up with the Santa Fé agent at Coffeyville, and that it would probably take a week or more to get the goods back, but that, if plaintiff would go to the office of the Santa Fé in this city, he would find it had a direct wire to Coffeyville and could get the shipment back in three days. On this suggestion, plaintiff went to the office of the Santa Fé and explained the situation, saying at the same time that if he could get the goods back in three days he could sell them for their full value, but otherwise the season for their sale would be lost. The agent of the Santa Fé agreed to telegraph to Coffeyville and ascertain whether the goods were still in possession of his company, and, if so, he promised to have them returned at once by express. On May 3d plaintiff was notified by the Santa Fé agent that the package had been delivered to the consignee on March 28, 1912. Having again communicated with the consignee, plaintiff was told that the goods had not been accepted, of which fact plaintiff informed the Santa Fé agent, and was again told that the goods had been delivered to the consignee on March 28th. Later the Santa Fé's representatives discovered this was a mistake, and about May 20th they informed plaintiff of their error, that the case had never been delivered and was still in their possession, and asked what disposition plaintiff wished made of it. Thereupon plaintiff declared that he had lost his market for a sale of the goods and demanded reparation from the Santa Fé. The goods were finally returned to plaintiff, but at his expense, and were sold at a considerable loss, for which this action was brought.

The question whether the defendant or the Santa Fé were under any duty to promptly notify plaintiff that the consignee had refused to accept the goods is not, I think, in the case, because concededly plaintiff received notice from the consignee that the goods had been rejected, and up to April 28th, when he called on defendant and informed it of this fact, the goods had not depreciated in value, and plaintiff had suffered no damage. The loss occurred thereafter, and arose from the misinformation received by plaintiff from the Santa Fé on May 3d that the package had been delivered, and the subsequent failure of the Santa Fé to return the goods as directed. If defendant is under any liability, I see no reason for releasing it because of plaintiff's negotiations with the Sante Fé. If the Sante Fé was defendant's agent when it was first approached by plaintiff, it was as much defendant's duty as it was the duty of the Sante Fé to inform plaintiff correctly as to whether the goods had or had not been delivered, and,

if they had not been, then to return the goods on plaintiff's request—and for the performance of this duty, especially in the light of the fact that the plaintiff sought the Santa Fé at the defendant's suggestion, plaintiff had the right to treat with the Santa Fé, because it was a matter directly concerned with its agency.

We are thus brought to the main question: Because of the exceptions in the bill of lading, the defendant cannot be held for any loss, unless it be under that part of section 20 of the Interstate Commerce Act, known as the Carmack amendment. The defendant claims that the act was intended to apply only so long as the goods are en route and the duty of the carrier qua carrier continues; that where transportation has been completed to the ultimate point of delivery, and notice of arrival has been given, or the fact of arrival has been brought home, to the consignee, the obligation of the initial carrier ceases, and the act no longer applies. I think this is too narrow a construction and one in accord neither with the letter nor the spirit of the act. The reasons for the passage of the act were judicially noticed in Atlantic Coast Line R. R. Co. v. Riverside Mills, 219 U. S. 186, 200, 201, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7, where it is said to have been the intention of Congress to give to the shipper the benefit of a through contract against the initial carrier, and to relieve him in case of loss or damage from being compelled to go to some distant point and there inconveniently and expensively pursue his remedy against the carrier actually responsible for the injury. Speaking of its civil as distinguished from its penal provisions, Mr. Justice White, writing for the court in N. Y., N. H. & H. R. R. Co. v. I. C. C., 200 U. S. 361, 391, 26 Sup. Ct. 272, 277 (50 L. Ed. 515), said that:

"The statute was remedial, and is therefore entitled to receive that interpretation which reasonably accomplishes the great public purpose which it was enacted to subserve."

It is true it is commonly said that, after goods have arrived at their destination and the consignee has had notice of their arrival and a reasonable opportunity to take the goods away, the responsibility of the carrier as such ceases and it becomes a warehouseman. But this, I take it, is an expression of the nature of the duty and obligation then resting upon the carrier, and is not by any means intended as expressive of the view that the carrier is then relieved of all duties and obligations growing out of its original contract with the shipper. As was said in Becker v. Penn. R. R. Co., 109 App. Div. 230–234, 96 N. Y. Supp. 1, 4:

"The common carrier, however, does not necessarily relieve himself from all liability by giving timely notice to the consignee of the arrival of the goods, even although he fails to remove them within a reasonable time. 'If the consignee neglected to accept or receive the goods, the carrier is not thereby justified in abandoning them, or in negligently exposing them to injury. If they are not accepted and received when notice is given of their arrival, he may relieve himself from responsibility by placing the goods in a warehouse for and on account of the consignee; but, so long as he has the custody, a duty devolves upon him to take care of the property and preserve it from injury.' (Scheu v. Benedict, 116 N. Y. 513 [22 N. E. 1074, 15 Am. St. Rep. 426]."

This duty does not arise out of any new agreement, but is an implied obligation growing out of the original contract of carriage. Chicago & Alton R. R. Co. v. Kirby, 225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501; Great Western Ry. Co. v. Crouch, 3 Hurlst. & N. 182, 195; Metzenburg v. Highland Ry. Co., 7 Scotch Sess. Cas. (3d Series) 919, 922. As I have shown, the breach of duty in this case arose from the misinformation given by the Santa Fé concerning the fact of delivery, thus preventing plaintiff from securing a return of the goods in time to enable him to sell them for a sum which then represented their value. Had the loss arisen with respect to some matter pertaining to the return of the goods, as distinguished from their delivery, it might be plausibly urged that a new contract had .attached, to which the initial carrier for the original carriage was a stranger.

But I can see no difference between the present case, where the loss arose from misinformation given by the ultimate carrier concerning the fact of delivery, and one where the loss arose out of its misdelivery or total failure to deliver. By its through bill of lading this defendant constituted the Santa Fé its agent "for all purposes of transportation and delivery," and the case must be treated as though the ultimate point of destination was on defendant's own line, and defendant's obligations are the same as if the loss complained of had been occasioned by its negligence. Galveston, Harrisburg & San Antonio Ry. Co. v. Wallace, 223 U. S. 481, 491, 492, 32 Sup. Ct. 205, 56 L. Ed. 516.

In Nashville, C. & St. L. Ry. Co. v. Dreyfuss-Weil Co., 150 Ky. 333, 150 S. W. 321, it was held that, where goods were shipped to the order of the shipper with instructions to notify another party on arrival, it was incumbent upon the company to notify the shippers, on refusal of the person named in the bill of lading to be notified to accept delivery, and that the initial carrier was liable under the act for the destruction of the goods while lying in the warehouse of the ultimate carrier, no such notice having been given. In that case the court, relying on the term "transportation" as defined in section 1 of the act, said that:

It "must be presumed to have been intended by Congress to go as far as Congress had power to regulate the subject, and to make the initial carrier liable for any loss of the property until its interstate shipment was completed."

Section 1 of the act says:

"The term 'transportation' shall include * * * all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported."

I can conceive of no circumstances under which "storage" may become a part of the duty of a carrier by land, while the goods are en route or before they have reached their final destination and the duty to deliver has attached. Undoubtedly the Interstate Commerce Commission has jurisdiction to regulate storage charges of railroads amenable to the act. Their exercise of such jurisdiction is notorious. See Wilson v. Penn. R. R. Co., 14 Interst. Com. R. 170. It seems

to me clear, taking the above paragraph of section 1 as a whole, and having regard for the phrase "storage and handling of property transported," and especially in view of the intent of Congress in passing the act, that the duties imposed by the act continue until every obligation assumed by or as a necessary incident to the contract of carriage has been fully performed.

Nor do I find anything in section 20 to limit this result. By it the initial as well as the subsequent carrier is made liable "for any loss, damage or injury to such property." This phrase is not necessarily confined to physical "damage or injury." The words must have been used with regard for their effect on the *value* of shipments, which was the practical question involved, and the value of seasonable goods may as readily be diminished by their unlawful detention until the season had passed as by acts causing physical depreciation. In Coovert v. Spokane, P. & S. Ry. Co., 80 Wash. 87, 141 Pac. 324, the consignee had refused to accept the goods, whereupon the consignor surrendered the bill of lading to the initial carrier and ordered the return of the shipment; but the ultimate carrier thereafter delivered the goods to the consignee, and they were lost to the consignor. It was held that the initial carrier was liable under the act, and could be held as for a conversion. This case goes further than it is necessary to go in the one under consideration, because the loss arose from an act done after a return order had reached the ultimate carrier.

If the case of Norfolk & W. Ry. Co. v. Stuart's Draft Milling Co., 109 Va. 184, 63 S. E. 415, is opposed to the foregoing views, I think it was not well decided, and is opposed both to reason and authority.

I think the determination was right, and should be affirmed.