Argued May 7, affirmed May 29, 1917.

STODDARD LUMBER CO. v. OREGON-
WASHINGTON R. & N. CO.

(165 Pac. 363.)

**Carriers—Carriage of Goods—Delivery—Duty of Carrier.**

1. At common law, when it became impossible for a common car-
rier to deliver shipments in accordance with the contract of carriage,
it was its duty to exercise ordinary care and diligence for the pro-
tection of the property of the owner.

**Carriers—Carriage of Goods—Failure to Deliver Goods to Consignor.**

2. Where a common carrier is unable to deliver the goods shipped
to the consignee, it is its duty to exercise due diligence to notify the
consignor within a reasonable time.

**Carriers—Carriage of Goods—Failure to Deliver—Notice.**

3. Where a common carrier is unable to deliver the goods shipped
to the consignee, the burden is upon it to show a state of facts re-
lieving it from its duty to notify the consignor within a reasonable
time.

**Carriers—Carriage of Goods—Notice of Failure to Deliver.**

4. Where goods are consigned by a shipper to its own order, with
directions to notify a person named, upon failure of the carrier to

deliver the goods it is not sufficient that it notify such person, but it must notify the consignor, if the bill of lading shows that he is the owner of the goods.

### Carriers—Carriage of Goods—Connecting Carriers—Notice of Nondelivery.

5. Where a carrier is unable to deliver the goods, which have been shipped through connecting carriers, the Carmack Amendment treats such carriers as if they were controlled by a single corporation, and the initial carrier is not relieved of its duty to notify the consignor because the terminal carrier did not know his residence; such carrier being chargeable with the knowledge of the initial carrier thereof.

> [As to burden of proof as between connecting carriers as to which one is liable, see note in 101 Am. St. Rep. 392.]

### Carriers—Carriage of Goods—Notice of Nondelivery.

6. Where goods are shipped to the consignor's order, with directions to notify the purchaser of the goods, the carrier cannot extend credit to such person, but must give notice of nondelivery not later than the day following that on which the goods were offered to the purchaser.

### Carriers — Carriage of Goods — Notice of Nondelivery — Carmack Amendment.

7. Under the Carmack Amendment (Act June 29, 1906, c. 3591, § 7, 34 Stat. 595 [U. S. Comp. Stats. 1916, § 8604a]), providing that any common carrier, receiving property for transportation from a point in one state to a point in another state, shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss caused by it, or by any common carrier to which such property may be delivered, or over whose lines such property may pass, the initial carrier is liable for the failure of the terminal carrier to properly notify the consignor of failure to deliver goods shipped.

### Appeal and Error—Review—Harmless Error.

8. In an action against an initial carrier for damages because of the terminal carrier's failure to give notice of nondelivery of the goods shipped, admission of evidence of the custom of railway companies to give notice when the shipment cannot be delivered, if error, was harmless, where such evidence only tended to charge defendant with its legal duty.

### Carriers—Carriage of Goods—Nondelivery of Goods.

9. Where goods are shipped to the consignor's order with directions to notify purchaser thereof, the carrier will not be relieved of its duty to exercise due diligence in caring for goods because of the fact that the consignee is derelict in his duty to receive the goods.

### Carriers—Carriage of Goods—Notice of Nondelivery—Agency.

10. Where goods are shipped to the consignor's order, and the bills of lading are sent to a bank at destination, such bank is the consignor's agent for the purpose of presenting the draft only, and not for the purpose of receiving notice that the goods cannot be delivered.

##### Carriers—Carriage of Goods—Notice of Claim.

11. In an action against a common carrier for damages, due to failure to notify consignor of nondelivery of goods, failure to present a formal bill as a claim for damages within the time limited in the contract was not fatal, where defendant was notified in writing that the consignor had a claim against them and insisted upon its payment; such notification having been given in due time.

##### Appeal and Error—Review—Harmless Error—Instructions.

12. In an action against a common carrier for failure to notify the consignor of nondelivery, an instruction that the measure of damages was the difference between the market value of the goods when notice should have been given and their value when it was actually given, if erroneous, was harmless, where the verdict gave the proper amount of damages.

##### Carriers—Carriage of Goods—Notice of Nondelivery.

13. In an action against a common carrier for damages due to failure to give the consignor notice of nondelivery, where the bill of lading provided that the purchaser should have 10 days within which to pay for the goods, the duty did not devolve upon the carrier to give notice of nondelivery until after the expiration of such 10 days.

##### Appeal and Error—Presentation of Grounds—Failure to Raise Question.

14. Questions not raised in the lower court will not be reviewed.

From Baker: Gustav Anderson, Judge.

Action for damages by the Stoddard Lumber Company, a corporation, against the Oregon-Washington Railroad & Navigation Company, a corporation. From a judgment entered on a verdict of a jury in favor of plaintiff, defendant appeals. Affirmed.

In Banc. Statement by Mr. Justice McCamant.

This is an action brought to recover damages sustained by plaintiff's assignors, Stoddard Lumber Company, a Utah corporation, and Shockley & McMurren Lumber Company, by reason of the alleged failure of a connecting carrier of the defendant to notify plaintiff's assignors of the nondelivery of shipments of box shooks carried over the lines of defendant and its connecting carriers, in the year 1912. The complaint sets up five causes of action. It appears that plaintiff's

assignors had received orders from Pierce & Maternes, of Hotchkiss, Colorado, for the shooks in question and that pursuant to these orders the first carload was shipped from Baker, Oregon, July 29, 1912, reaching Hotchkiss on August 12th. The car mentioned in the second count of the complaint left Baker August 2d and reached Hotchkiss August 14th; that mentioned in the third count left Baker August 17th, arriving at Hotchkiss September 7th; that in the fourth count left Baker August 19th and reached Hotchkiss September 4th; that mentioned in the fifth count, being the car sold by Shockley & McMurren Lumber Company, left Baker August 10th and reached Hotchkiss August 23d. The shipments were in each case consigned to the order of the shipper and a direction was written on the bill of lading requiring the carrier to notify Pierce & Maternes. The bill of lading in each case was handed by plaintiff's assignors to the Baker Loan & Trust Company, by which course it was transmitted to the Bank of North Fork at Hotchkiss, Colorado. A draft for the purchase price accompanied the bill of lading, and the instructions given to the Hotchkiss bank required it to insist upon payment of the draft before surrender of the bill of lading.

The goods in each case reached Hotchkiss over the lines of the Denver & Rio Grande Railroad Company. It is conceded that this carrier notified Pierce & Maternes and that Pierce & Maternes failed to take up the bills of lading. The defendant alleges in its answer that these purchasers promised from day to day that they would secure the bills of lading and accept delivery of the goods, but no evidence was offered in support of this allegation. No notice was given plaintiff's assignors of the nondelivery of the goods, and on September 26th they applied to the de-

fendant at Baker to send a tracer after the shipments. On the following day, September 27th, they were notified that the box shooks were still undelivered at Hotchkiss. The shooks were suitable for the making of peach boxes and for no other purpose. At the time when they reached Hotchkiss the evidence satisfactorily shows an active market for peach boxes, justifying the conclusion that if plaintiff's assignors had been promptly notified they could have disposed of the goods. About September 15th the peach crop in that part of Colorado was destroyed by frost and thereafter the box shooks were unsalable. By the time plaintiff's assignors were notified of the nondelivery of the goods considerable charges had accumulated against them for freight and demurrage. Plaintiff's assignors refused to pay these charges. The railroad company thereupon stored the goods in the vicinity and sold them during the following season, accounting to plaintiff's assignors for the net proceeds, which were received under a stipulation that plaintiff should not be prejudiced thereby in this litigation.

Plaintiff claims the right to charge the defendant with the dereliction of its connecting carrier, under the Carmack Amendment to the Interstate Commerce Law. The jury found for plaintiff in the invoice value of the shipments, less the sums which had been paid plaintiff's assignors on the sale of the box shooks in 1913. The defendant appeals.  AFFIRMED.

For appellant there was a brief over the names of *Mr. William D. Riter* and *Mr. James H. Nichols,* with an oral argument by *Mr. Riter.*

For respondent there was a brief and oral argument by *Mr. John L. Rand.*

MR. JUSTICE MCCAMANT delivered the opinion of the court.

Plaintiff's right of action in this case is based wholly on its contention that where goods cannot be delivered by a terminal carrier in accordance with the contract of transportation, the duty devolves on such carrier to notify the owner of the goods, whether he be consignor or consignee. This principle is challenged by counsel for defendant. The liability of an initial carrier under the Carmack Amendment is only that imposed by the common law on its connecting carrier: *Adams Express Co.* v. *Croninger*, 226 U. S. 491, 511 (57 L. Ed. 314, 44 L. R. A. (N. S.) 257, 33 Sup. Ct. Rep. 148) ; Judson on Interstate Commerce (2 ed.), § 46. The common law was evolved before the days of mail and telegraphs. We cannot, therefore, expect to find in the common law anything more than a statement in general terms of the duties devolving on a common carrier when it becomes impossible for the carrier to deliver shipments in accordance with the contract of carriage.

1. The common-law principle is that in such case the carrier is charged with the duty of ordinary care and diligence for the protection of the property of the owner: 4 Elliott on Railroads (2 ed.), § 1463; 2 Hutchinson on Carriers (3 ed.), § 714. What, then, is the duty which ordinary care and diligence, as applied to the conditions under which we live, impose upon a terminal carrier when it is unable to deliver a shipment at the point of destination? The shipments so carried by interstate carriers are of great variety; some of them are perishable, many of them fluctuate in value, many of them are valuable only in limited territories and for short seasons, and their marketing often requires special skill and instruction. It is not

to be expected that the terminal agents of the carrier will be advised in all cases of the value of the shipments, or of the proper method of caring for them and protecting their owners from loss. The Interstate Commerce Commission, in the case of *Kehoe & Co.* v. *Nashville etc. Ry. Co.,* 14 I. C. C. 555, 556, said:

"It is in the interest of the public that the consignor should be promptly notified when the shipment is not delivered."

We think the interests of the carrier are subserved by a rule which requires notice to the consignor within a reasonable time after the refusal or failure of the consignee to accept delivery. A rule which requires such prompt notification will be of value in releasing the rolling stock of the carrier and making it available for future business. Ordinarily, a postcard notification would be sufficient.

2. There is a conflict of authority on the question as noted by this court in *Normile* v. *Oregon Nav. Co.,* 41 Or. 177, 182 (69 Pac. 928). We think the weight of authority sustains the principle that in such case the carrier must exercise due diligence to notify within a reasonable time: 5 Thompson on Negligence, § 6622; 12 Am. & Eng. Enc. Law (2 ed.), 557; *Nashville etc. R. Co.* v. *Dreyfuss-Weil Co.,* 150 Ky. 333 (150 S. W. 321); *American etc. Co.* v. *McGhee,* 96 Ga. 27 (21 S. E. 383); *Alabama etc. Co.* v. *McKenzie,* 139 Ga. 410 (45 L. R. A. (N. S.) 18, 77 S. E. 647); *Michigan Co.* v. *Harville,* 136 Ill. App. 243, 253; *Carrizzo* v. *New York etc. Ry. Co.,* 66 Misc. Rep. 243 (123 N. Y. Supp. 173); *Fine* v. *Barrett,* 81 Misc. Rep. 234 (142 N. Y. Supp. 533); *Sauer* v. *Lehigh Valley R. Co.,* 150 N. Y. Supp. 977. This court is partially committed to the doctrine of these authorities: *McGregor* v. *Oregon Ry. & Nav. Co.,* 50 Or. 527, 536, 537 (93 Pac.

465, 14 L. R. A. (N. S.) 668). As applied to interstate shipments the question is one of federal law and the federal Supreme Court is the final arbiter. Its decisions trend in the direction of the above rule: *The Thames,* 14 Wall. 98, 107 (20 L. Ed. 804); *North Penn. R. Co.* v. *Commercial Nat. Bank,* 123 U. S. 727, 734 (31 L. Ed. 287, 8 Sup. Ct. Rep. 266).

3. Circumstances will doubtless arise from time to time which will relieve the carrier from this duty, as for example, when the owner of the goods has no place of abode: *Butler* v. *East Tennessee etc. R. Co.,* 8 Lea (Tenn.), 32, 34. The burden of showing such a state of facts devolves on the carrier.

The authorities cited by the defendant state no consistent rule. Some of them hold that the duty of carriers is a variable duty, dependent upon the circumstances: *The Keystone* v. *Moies,* 28 Mo. 243, 246 (75 Am. Dec. 123); *Manhattan etc. Co.* v. *Chicago etc. R. Co.,* 9 App. Div. 172 (41 N. Y. Supp. 83, 85); *Kremer* v. *Southern Express Co.,* 6 Cold. (46 Tenn.) 356. Some of the authorities relied on by defendant involve no question of notice: *Fisk* v. *Newton,* 1 Denio (N. Y.), 45 (43 Am. Dec. 649); *Ginnochio etc. Co.* v. *Missouri etc. R. Co.,* 153 Mo. App. 598 (134 S. W. 1028). Others of the authorities cited sustain defendant's contentions: *Hudson* v. *Baxendale,* 2 Hurl. & N. 575; *Weed* v. *Barney,* 45 N. Y. 344 (6 Am. Rep. 96). These cases are out of harmony with the weight of American authority and, in our judgment, are not sustained by sound reasoning.

The lower court charged the jury in the case at bar that the terminal carrier was chargeable with the duty of due diligence in the protection of the property of plaintiff's assignors and that if the jury found that reasonable care of the property required notice to

plaintiff's assignors, then the jury should find for plaintiff on this issue. We think the charge of the court was more favorable to the defendant than was warranted by the law.

4. The defendant contends that the above principle is inapplicable to this case because the goods were consigned by the shipper to its own order, with directions to notify Pierce & Maternes; that by this method of shipment the shipper made Pierce & Maternes its agents for the purpose of receiving notice, and that when the terminal carrier gave notice to Pierce & Maternes it fulfilled its duty in the premises. This contention of the defendant is supported by the case of *Hardin Grain Co.* v. *Chicago etc. R. Co.*, 134 Mo. App. 681 (114 S. W. 1117, 1118). On this issue plaintiff relies largely on the case of *Nashville etc. R. Co.* v. *Dreyfuss-Weil Co.*, 150 Ky. 333 (150 S. W. 321). The facts in this case are closely akin to those in the case at bar. Plaintiff in the Kentucky case shipped goods from Paducah, Kentucky, to De Soto, Georgia, consigned to itself, with instructions to notify R. E. Howe. Howe was notified by the terminal carrier and refused to take the goods. The carrier neglected to notify plaintiff, and while the goods were held in the carrier's warehouse they were destroyed by fire. The Kentucky court said:

"When the goods reached De Soto, Ga., and R. E. Howe, on being notified of their arrival, refused to accept them, it was incumbent upon the carrier to notify Dreyfuss-Weil Company of this fact, for, if they had been notified that their goods were there, they might have taken steps to protect themselves. The bill of lading showed that the goods were the property of Dreyfuss-Weil Company. The goods were consigned to their order. While there is some conflict in the decisions on the subject, the better rule is: That, where the consignee refuses to accept the goods, the carrier

must notify the consignor of this fact if the bill of lading is sufficient to show that he is the owner of the goods. This rule has the approval of the United States Supreme Court and the Supreme Court of Georgia. See *American Sugar Refining Co.* v. *McGhee,* 96 Ga. 27 (21 S. E. 383); Hutchinson on Carriers (3d ed.), § 721. When Howe refused to accept the goods, the carrier held them subject to the shipper's order, and notice to the shipper was essential to his protection. We therefore conclude that the Seaboard Air Line having failed to notify Dreyfuss-Weil Company of the refusal of Howe to accept the goods was liable to the shipper for the subsequent destruction of the goods while lying in its warehouse.''

We think the case last cited correctly states the law. It appears from the books that goods are frequently shipped consigned to the order of the shipper, with instructions to notify someone for whom the goods are intended: *North Penn. R. Co.* v. *Commercial Nat. Bank,* 123 U. S. 727, 736 (31 L. Ed. 287, 8 Sup. Ct. Rep. 266); 4 Elliott on Railroads, 1427, 1530; 4 R. C. L., p. 842. The purpose of shipping in this manner is plain; it is the intention of the shipper in every such case to exact payment of the purchase price of the goods on delivery. In the case at bar plaintiff proved without objection from the defendant a general custom to ship in this manner when the shipper is unwilling to extend credit to the purchaser by whom the goods are ordered. The answer shows affirmatively that the purpose and effect of shipping in this manner were understood by the defendant.

5. The defendant contends that it should be relieved of the duty to notify in the case at bar because there was no evidence tending to show that the terminal carrier knew the residence of the consignor. The effect of the Carmack Amendment is to treat a line of connecting carriers as if they were owned and controlled by

a single corporation. The terminal carrier is chargeable with the knowledge of the initial carrier and it appears from the record in this case that plaintiff's assignors had many dealings with the defendant and the defendant must have been apprised of their place of business. We think, furthermore, that no carrier can be held to have fulfilled its duty of due diligence in the matter of notification when it has made no effort to notify the consignor at the place where the shipment originates.

6. There is no evidence of a refusal on the part of Pierce & Maternes to receive the goods in question, but the pleadings admit their failure so to do. The defendant contends that this circumstance differentiates the case at bar from the ordinary case, and that the terminal carrier was justified in assuming from day to day that Pierce & Maternes would take the box shooks, thus rendering notification unnecessary. We do not think that the duty of notification arises as a matter of law immediately on the tender of the goods to the purchasers unless the purchasers refuse to accept them. On the other hand, the carrier is unauthorized to extend any appreciable time by way of credit to the purchasers. The fact that the goods are consigned to the order of the shipper is evidence that the shipper is unwilling to extend credit to the purchaser. The principles of the law of agency forbid the carrier to extend to the purchaser a credit which the shipper was unwilling to grant. We think the duty of the carrier to notify is analogous to the duty arising under the law-merchant on the dishonor of negotiable paper and that therefore the notification should not be deferred beyond the day following that on which the goods are offered to the purchaser.

7. Plaintiff finds no fault with anything done by the defendant, basing its right of recovery wholly on the liability of the defendant under the Carmack Amendment to answer for the fault of the Denver & Rio Grande Railroad Company, the terminal carrier. The defendant contends that the Carmack Amendment is inapplicable to such a complaint as that made in the case at bar. The amendment in question, in so far as it is material to the present case, is as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass": 34 Stats. at Large, p. 595.

The defendant cites *Norfolk etc. R. Co.* v. *Stuart's Draft Mill Co.,* 109 Va. 184 (63 S. E. 415, 416, 417); *Hogan Mill Co.* v. *Union Pacific Co.,* 91 Kan. 783 (139 Pac. 397). These authorities seem to sustain the defendant's contention, but the construction of this statute is a federal question and the United States Supreme Court has construed it: *New York etc. R. Co.* v. *Peninsula etc. Exchange,* 240 U. S. 34, 37 (60 L. Ed. 511, 36 Sup. Ct. Rep. 230). This was an action for damages arising from delay in the transportation of merchandise. It was contended that the initial carrier was not liable, inasmuch as no injury had been done to the goods, and the case therefore fell without the operation of the amendment. The court said:

"We need not review at length the considerations which led to the adoption of this amendment. These were stated in *Atlantic Coast Line* v. *Riverside Mills,*

219 U. S. 186, 199–203 (55 L. Ed. 167, 31 Sup. Ct. Rep. 164, 31 L. R. A. (N. S.) 7). It was there pointed out that along with singleness of rate and continuity of carriage in through shipments there had grown up the practice of requiring specific stipulations limiting the liability of each separate company to its own part of the through route, and, as a result, the shipper could look to the initial carrier for recompense only 'for loss, damage or delay' occurring on its own line. This 'burdensome situation' was 'the matter which Congress undertook to regulate.' * * The rule, said the court in defining the purpose of the Carmack Amendment, 'is adapted to secure the rights of the shipper by securing unity of transportation with unity of responsibility.' * * It is now insisted that Congress failed to accomplish this paramount object; that while unity of responsibility was secured if the goods were injured in the course of transportation or were not delivered, the statute did not reach the case of a failure to transport with reasonable despatch. In such case it is said that, although there is a through shipment, the shipper must still look to the particular carrier whose neglect caused the delay. We do not think that the language of the amendment has the inadequacy attributed to it. The words 'any loss, damage or injury to such property' caused by the initial carrier or by any connecting carrier are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination. It is not necessary, nor is it natural in view of the general purpose of the statute, to take the words 'to the property' as limiting the word 'damage' as well as the word 'injury' and thus as rendering the former wholly superfluous. It is said that there is a different responsibility on the part of the carrier with respect to delay from that which exists where there is a failure to carry safely. But the difference is with respect to the measure of the carrier's obligation; the duty to transport with reasonable despatch is none the less an integral part of the normal undertaking of the carrier. And we can gather no

intent to unify only a portion of the carrier's responsibility.''

The initial carrier was held liable for the damage sustained.

For further authoritative construction of this legislation see *Georgia etc. R. Co.* v. *Blish Milling Co.,* 241 U. S. 190, 194 (60 L. Ed. 948, 36 Sup. Ct Rep. 541), and *Cleveland etc. R. Co.* v. *Dettlebach,* 239 U. S. 588 (60 L. Ed. 453, 36 Sup. Ct. Rep. 177). Under the construction which has been placed by the federal Supreme Court on the Carmack Amendment we are clear that the defendant is chargeable with the neglect of the Denver & Rio Grande Railroad Company to notify plaintiff's assignors.

8. The defendant contends that there was error in admitting evidence of the custom of railway companies to give notice when a shipment cannot be delivered. The evidence objected to tended only to charge the defendant with the duty devolving upon it under the law, and its admission was therefore harmless error, if error at all.

9. The defendant strenuously contends that it was the duty of plaintiff's assignors to be present at Hotchkiss to receive the goods. Many of the authorities announce the doctrine that the duty of the consignee to receive and that of the carrier to deliver are correlative duties, equally binding on the parties. An examination of these authorities discloses the fact that the doctrine so announced is incidental to the determination of the question of when the liability of the carrier as an insurer terminates. It is held that the consignee cannot extend the period in which the carrier is an insurer by failure to take the goods when the carrier is ready to deliver them: 2 Hutchinson on

Carriers (3 ed.), § 723. It does not follow that the failure of the consignee to take the goods works a forfeiture or relieves the carrier of its duty to exercise due diligence in caring for them.

10. It is next contended that the bank of Hotchkiss was the agent of plaintiff's assignors, and that therefore the knowledge of the bank was the knowledge of plaintiff's assignors. Inasmuch as this bank knew that the drafts drawn on Pierce & Maternes were not taken up and the bills of lading were not surrendered it is argued that plaintiff is chargeable with this knowledge. It is alleged in the complaint that plaintiff's assignors sent the respective drafts with bills of lading attached to the Hotchkiss bank with proper instructions. These allegations are admitted by the answer. We think that the pleadings admit that the Hotchkiss bank was the agent of plaintiff's assignors: 3 R. C. L., pp. 610, 622, 624; 1 Mechem on Agency (2 ed.), §§ 332, 333, 337; 31 Cyc. 1597; *Bank of Washington* v. *Triplett,* 1 Pet. (U. S.) 25; (7 L. Ed. 37); *Wilson* v. *Smith,* 3 How. (U. S.) 763, 769, 770 (11 L. Ed. 820).

"It is a familiar and well-settled rule that, as to third parties, notice to an agent while acting within the scope of his authority is notice to the principal. But it is equally as well settled that such notice, in order to bind the principal, must relate to the business or transaction in reference to which the agent is authorized for and on behalf of his principal, and to matters over which his authority extends: Story on Agency, § 118; Mechem on Agency, § 718. If it relates to a matter over which the agent has no authority, and concerning which he is not authorized to act for his principal, although he may be an agent for other purposes, it will not affect the principal or be binding on him": *Pennoyer* v. *Willis,* 26 Or. 8 (36 Pac. 568, 46 Am. St. Rep. 594).

The authority of the Hotchkiss bank extended only to the collection in each case of the draft and the surrender of the bill of lading. It had no physical control over the goods or authority to deliver them. There is no evidence that it had any knowledge as to the whereabouts of the freight and if it had, such knowledge cannot be imputed to plaintiff's assignors because it would be without the scope of the agency. The goods should not have been delivered by the terminal carrier without surrender of the bill of lading, but our attention has been directed by the authorities cited in the briefs of these parties to a number of cases where goods have been delivered by the carrier without demanding the bill of lading. See, for example, *Georgia etc. R. Co.* v. *Blish Milling Co.,* 241 U. S. 190 (60 L. Ed. 948, 36 Sup. Ct. Rep. 541). It may be that the knowledge imputable to plaintiff's assignors that the drafts were unpaid and the bills of lading unsurrendered was enough to create suspicion in their minds that the goods had not been delivered, but we think the doctrine of constructive notice is inapplicable to this case. The defendant's connecting carrier neglected to notify the shippers. It cannot excuse its neglect by showing that they could have secured the information in question by inquiry from someone else. If the shipper has actual knowledge of the nondelivery of the shipment the carrier will be absolved from liability: 2 Hutchinson on Carriers (3 ed.), § 721; *Manhattan etc. Co.* v. *Chicago etc. R. Co.,* 9 App. Div. 172 (41 N. Y. Supp. 83, 85); *Wien* v. *New York etc. R. Co.,* 166 App. Div. 766 (152 N. Y. Supp. 154). This is as far as the authorities go.

11. The defendant asked a directed verdict as to the third count in the complaint, on the ground that no claim had been presented with reference to the ship-

ment covered by this count until April 22, 1913.  The bill of lading in question provided that:

"Claims for loss, damage or delay must be made in writing to the carrier at the point of delivery or at the point of origin within four months after delivery of the property, or in case of failure to make delivery, then within four months after a reasonable time for delivery has elapsed.  Unless claims are so made the carrier shall not be liable."

It is true that no formal bill stating in dollars the damages of plaintiff's assignors was presented to the defendant until April 22, 1913, but under date of December 19 and December 22, 1912, the defendant was notified in writing that plaintiff's assignors had such a claim and insisted upon its payment.  These letters were specific as to the shipment in question and gave defendant the preliminary information necessary to a proper investigation of the facts.  These letters were a sufficient assertion of the claim within the construction placed upon the clause in question by the federal Supreme Court: *Georgia Co.* v. *Blish Milling Co.*, 241 U. S. 190 (36 Sup. Ct. Rep. 541, 545).

12.  The defendant challenges the correctness of the instruction given by the lower court on the measure of damages:

"If you find for plaintiff, the measure of damages for you to determine from the evidence should be the difference between the market value of the goods at Hotchkiss, Colorado, at the time the owner should have been notified of their arrival and non-delivery if due care had been taken, and the market value the goods had at same place at or about the time the shipper did receive such notice and was offered opportunity to receive the goods.  You will ascertain the value, the market value of the goods at Hotchkiss, Colorado, at the time when the plaintiff's predecessors should have had notice of the non-delivery, and ascer-

tain the value of the goods when the shippers were actually informed that the goods had been received and not delivered and the difference in those values would be the measure of damages, if you find defendant was negligent under the instructions heretofore given and that the plaintiff is entitled to damages and from the amount you thus arrive at if you find for the plaintiff you will deduct the amount it is admitted was paid to the plaintiff's predecessors and state that balance in your verdict.''

It is contended that this instruction is error because there was no evidence in the record as to the market value of the box shooks at the time when notice was given plaintiff's assignors. The record sufficiently shows the market value of the shooks at the time when they were shipped, but it appears affirmatively that there was no market for them subsequent to September 15, 1912. The case of *Hardin Grain Co.* v. *Chicago etc. R. Co.,* 134 Mo App. 681 (114 S. W. 1117, 1118) sustains the defendant's contention that it is error to instruct the jury to measure damages by the market value when there is no evidence of market value. A careful reading of the foregoing instruction given by the lower court indicates that the court corrected himself as to the point in question and that the jury must have understood that the measure of damages would be the difference between the market value of the goods when plaintiff's predecessors should have had notice, and their value when notice was actually given. There was but little evidence in the record tending to show what was the value of the goods when notice was given. One of plaintiff's witnesses testified that they had some value, but the only testimony tending to fix this value in dollars is the amount which was secured for the box shooks when sold under the direction of the Denver & Rio Grande Railroad Company in 1913. It

is apparent from the verdict that the jury gave credit for this amount and we think, therefore, that the error, if any, in the instruction of the court, was harmless within the rule announced in *Lemler* v. *Bord*, 80 Or. 224, 228–230 (156 Pac. 427, 1034).

13. There remains a single question. It is alleged in the answer:

"That it was the shipper's intention that Pierce & Maternes should have at least ten days to take up the bill of lading after the arrival of the car, for it notified both Pierce & Maternes and the bank that a discount of two per cent would be allowed if the draft were paid within ten days."

As to the first, second and fourth counts in the complaint, the testimony sustains this allegation. It clearly appears that the three cars of shooks referred to in these counts were sold on a contract under which Pierce & Maternes were allowed ten days in which to make payment, and were given a cash discount of 2 per cent if they paid within that time. As to the fifth count, while the allegation is identical the proof is that the purchasers were allowed 60 days' time within which to make payment. The defendant is, of course, limited to its allegations and cannot avail itself of proof unsupported by its pleading. The record, therefore, would seem to show that Pierce & Maternes were allowed 10 days within which to pay the drafts and take up the bills of lading for the cars reaching Hotchkiss August 12th, 14th and 23d and September 4th. The terminal carrier was not chargeable with neglect in failing to notify the shipper until after the expiration of the 10 days in question. As to the cars reaching Hotchkiss August 12th, 14th and 23d, it was competent for the jury to find that a notice given the shipper at the expiration of 10 days from the arrival

84 Or.—27

of the cars would have averted the loss, but such a conclusion cannot have been reached by the jury with reference to the car which reached Hotchkiss on September 4th. The evidence is that the market broke in the middle of September; it would have taken at least two days for a notice by mail to reach plaintiff's assignors.

14. We think it clear, therefore, that defendant was entitled to prevail as to the cause of action set up in the fourth count of the complaint. If the defendant had moved for a directed verdict as to this count, its motion would have been well taken. No such motion was made, nor was the question otherwise raised in the Circuit Court. This court is exercising appellate jurisdiction; its province is to review questions raised in the lower court; unless questions are raised there they are not reviewable here: *United States Mortgage Co.* v. *Marquam,* 41 Or. 391, 405 (69 Pac. 41); *State* v. *Anderson,* 10 Or. 448; *State* v. *Abrams,* 11 Or. 169 (8 Pac. 327).

On the whole case the record fails to show reversible error and the judgment is affirmed.        AFFIRMED.