## TRI–STATE PRODUCE CO. v. CHICAGO, B. & Q. R. CO.
### Civ. No. 637.

United States District Court,
N. D. Iowa, W. D.
April 30, 1952.

Bernard T. Caine, Abraham H. Baron and Philip R. Wigton, Sioux City, Iowa, for plaintiff.

Walter P. Loomis, Omaha, John S. Sears, Sioux City, Iowa, for defendant.

GRAVEN, District Judge.

The plaintiff, a shipper, commenced this action in the District Court of Iowa in and for Woodbury County against the defendant, an initial carrier, for damages claimed to have been sustained by it because of the claimed failure of the delivering carrier to give the plaintiff timely notice of the non-delivery of a car of frozen turkeys. In the alternative it claimed damages for the conversion of the car by the delivering carrier. The amount of damages claimed under either theory of recovery was $3,052.02. The action was brought against the defendant as the initial carrier under the provisions of the Carmack Amendment, 49 U.S.C.A. § 20(11). The plaintiff is an Iowa corporation and the defendant is an Illinois corporation. The defendant removed the case to this Court. Since there was diversity of citizenship between the parties and the amount in controversy is in excess of $3,000, the limitation against removal contained in 28 U.S.C.A. § 1445(b), is not applicable and the case was properly removed.

The plaintiff was and is engaged in the preparation of poultry for marketing and the marketing of poultry. In the transactions here involved it was represented by its president, Philip Sherman. Prior to December, 1949, the plaintiff entered into an oral agreement with J.A.W.D. Associates, a New York firm, for the sale of four cars of turkeys. Under the agreement the vendee agreed to pay the market price for such turkeys at New York City on the date of arrival. The present action relates to one of those cars. The car in question,

NP–91198, was loaded by the plaintiff with frozen turkeys. On December 10, 1949, that car was delivered to the defendant as initial carrier for transportation to New York City. The defendant issued to the plaintiff a Uniform Order Bill of Lading for the shipment. The shipment was by the bill of lading consigned to the order of the plaintiff. The destination of the shipment given in the bill of lading was Pier 13, New York City, New York. The bill of lading contained the following provision: "Notify J.A.W.D. Associates, 32 Tenth Avenue at New York, 14, State of New York." The plaintiff drew a sight draft on the J.A.W.D. Associates in the sum of $8,000. The sight draft with bill of lading attached was delivered by the plaintiff to the First National Bank in Sioux City, Iowa. That bank forwarded the sight draft with bill of lading attached to the Lawyers Trust Company in New York with instructions to surrender the bill of lading to J.A.W.D. Associates upon payment of the sight draft. Both in the bill of lading and by telegram the plaintiff allowed inspection of the contents of the car by the J.A.W.D. Associates. On December 15, 1949, the delivering carrier, the Delaware, Lackawanna & Western R. R. Co., notified the J.A.W.D. Associates by telephone that the car in question was leaving Buffalo, New York, and would arrive on December 16, 1949. The car reached Pier 13 at 6:30 a. m. on December 16, 1949. The delivering carrier notified the J.A.W.D. Associates by telephone of its arrival at 9:50 a. m. of that day. On the same day the plaintiff was also notified by telegraph of the arrival of the car. December 16, 1949, was a Friday. No deliveries of carloads of poultry are made in New York City on Saturdays and Sundays, and no poultry marketing transactions involving such cars are conducted on those days. On Monday, December 19, on Tuesday, December 20, and on Wednesday, December 21, 1949, the J.A.W.D. Associates were notified by telephone by the delivering carrier that the car was available on Pier 13. After the arrival of the car, the J.A.W.D. Associates inspected the car on several occasions accompanied by prospective purchasers but did not pay the sight draft and secure the bill of lading. The rail lines of the delivering carrier end at Hoboken, New Jersey, and the car was ferried across the Hudson River each morning and back again each evening on December 16, 19, 20, and 21, 1949, for attempted delivery to the J.A.W.D. Associates. On Thursday, December 22, 1949, the delivering carrier caused the contents of the car to be placed in cold storage in the warehouse of the Union Terminal Cold Storage Company of Jersey City, New Jersey. Warehouse receipts were issued to the delivering carrier therefor and the storage company was instructed to make delivery of the stored turkeys only upon the surrender of such warehouse receipts. The plaintiff claims that the delivering carrier did not give it notice of the non-delivery of the car until December 29, 1949, and that the first actual knowledge it had of such non-delivery was on that date. On Saturday, December 24, 1949, the plaintiff made inquiry of the First National Bank in Sioux City as to the payment of the sight draft. On December 24, 1949, at 12:54 p. m., the plaintiff sent the delivering carrier the following telegram:

"Your Failure To Notify Us Of Non Delivery Within 72 Hours Of Cars NWX 70195 AN NP 91198 Did Not Give Us The Opportunity To Divert To Some One Else Has Caused Us Damage And We Look To You To Reimburse Us For Any Damage And Expense Incurred By Your Negligence We Will File Claim With You For The Amount Of Damages And Expense."

On December 27, 1949, the freight agent of the delivering carrier at Pier 13, New York, sent the following telegram to the plaintiff:

"Yours Dec 24 NWX 70195 NP 91198 NWX 70195 Arrived Eleven AM Dec 19 Delivered Dec 22 NP 91198 Arrived Dec 16 Consignee Notified Twice Daily Never Refused Same Diverted Dec 21 By Consignee To Union Terminal Cold Storage."

456

On December 29, 1949, the freight agent of the delivering carrier at Hoboken, New Jersey, sent the following telegram to the plaintiff:

"Car NP91198 Waybill 567278 December 10Th 275 Boxes Turkeys Consigned Order Tri State Produce Company Notify JAWD Associates New York City Stored For Account Of DL And W Railroad In Union Terminal Cold Storage Company Jersey City Refused Advise Disposition File R And U 109."

On December 29, 1949, the Hoboken freight agent of the delivering carrier sent a written notice to the same effect to the plaintiff.

In answer to the freight agent's telegram of December 29, 1949, the plaintiff wrote the following letter:

"In answer to your wire of December 29, 1949, we are enclosing invoice on car NP 91198 and ask that you advise us how you wish this car handled.

"Inasmuch as it was through your negligence that this car is still in New York and unsold, we feel that it is your car. However, we will handle it for your account to the best of our ability as soon as you advise us."

On December 30, 1949, the General Claims Agent of the delivering carrier sent the following telegram to the plaintiff:

"Refer Carman's Wire NP-91198, Turkeys, Your Order Notify JAWD Associates, New York, Refused And Holding Shipment In Union Terminal Cold Storage For Protection Of Same. Wire Immediate Disposition. File MWS."

On December 29, 1949, J.A.W.D. Associates sent the following telegram to the plaintiff:

"Placed Car Number 91198 In Union Terminal Refrigerating Will Not Pick Up Draft Christmas Turkeys Unsatisfactory Still Getting Complaints Of Very Poor Grading And Finding Bruised Turkeys In So Called A'S Air Mailed A/C Sales."

The sight draft drawn on J.A.W.D. Associates was marked "Returned Unpaid" by the Lawyers Trust Company on January 6, 1950. The returned draft, together with the original bill of lading was received by the plaintiff a few days later. On February 20, 1950, the plaintiff sent the bill of lading to the delivering carrier, and shortly thereafter the warehouse receipts for the turkeys were returned by said carrier to the Union Terminal Cold Storage Company and were by it transferred to the plaintiff. The plaintiff sold the turkeys on March 22 or March 23, 1950, for the sum of $8,397.23. The storage charges on the turkeys amounted to $304.28. The turkeys did not suffer any deterioration in quality because of their being stored. It is the claim of the plaintiff that the delivering carrier was under a duty to notify it of the non-delivery of the turkeys not later than 7:00 a. m. on December 23, 1949. It claims damages for such breach in the sum of $3,052.02. It claims that the market for frozen turkeys in New York City was such that if it had been so notified it could have sold the carload in question for the sum of $11,144.97 instead of the sum of $8,397.23. The difference between these two figures is $2,747.74, in addition to which the plaintiff claims storage charges in the amount of $304.28, making the total amount of damage claimed $3,-052.02. The plaintiff claims in the alternative that the delivering carrier converted the car of turkeys. For such conversion the plaintiff claims damages in the same amount of $3,052.02. It is the claim of the defendant (1) that there was no conversion of the shipment by the delivering carrier; (2) that the delivering carrier was under no duty to notify the plaintiff of the non-delivery of the car; (3) that the plaintiff had actual knowledge of the delivery status of the car from December 16, 1949, on; (4) that the J.A.W. D. Associates were agents of the plaintiff and that the plaintiff was chargeable with their acts and with their knowledge; (5) that the plaintiff failed to establish any damages. The plaintiff's claim of conversion is based upon the storage of the turkeys in the warehouse by the delivering carrier. The bill of lading in question contained the following provision:

"Property not removed by the party entitled to receive it within the free

time allowed by tariffs, lawfully on file * * * after notice of the arrival of the property at destination * * * has been duly sent or given, and after placement of the property for delivery at destination has been made, * * * at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, * * *"

Under the applicable rules "free" time starts at 7:00 a. m. on the first business day following the day that notice is given of arrival. In the present case notice of arrival was given on Friday, December 16, 1949, and the "free" time started at 7:00 a. m. on Monday, December 19, 1949, and expired at 7:00 a. m. on Wednesday, December 21, 1949. The parties are in agreement as to the beginning and the expiration of the "free" time. The turkeys were not placed in storage by the delivering carrier until after the expiration of "free" time. The delivering carrier had the right under the bill of lading, after 7:00 a. m on December 21, 1949, to store the turkeys in a warehouse. Moreover, some courts are of the view that it was also under a duty to so do. See Estherville Produce Co. v. Chicago, R. I. & P. R. Co., 8 Cir., 1932, 57 F.2d 50. The turkeys were perishable goods, and the car had to be kept iced in order to preserve them in proper condition. In order to keep the car available at Pier 13 for delivery, it would have been necessary to keep ferrying it back and forth across the Hudson River. The turkeys were in fact placed in storage by order of the delivering carrier, and that carrier at no time surrendered dominion over the car to the J.A.W.D. Associates. The fact that the J.A.W.D. Associates may have advised or requested the delivering carrier to put the car in storage is not of significance, since that carrier had the right to do so anyway. Booth v. New York Central R. Co., 1921, 95 Vt. 9, 112 A. 894; Levers v. Atchison, T. & S. F. Ry. Co., 1917, 22 N.M. 599, 166 P. 1178, L.R. A. 1918A, 294; Quinn-Sheperdson Co. v.

Great Northern Ry. Co., 1918, 141 Minn. 100, 169 N.W. 422. It is the claim of the plaintiff that the telegram of December 27, 1949, sent by the Pier 13 freight agent of the delivering carrier, and the telegram of December 29, 1949, sent by J.A.W.D. Associates, indicate that the car was put in storage pursuant to the order of J.A.W. D. Associates. The defendant denies that the telegrams so state. It has been held that although an agent of the carrier erroneously notifies the shipper that delivery was made to the "notify party," the carrier may nevertheless prove that there was in fact no delivery. See Levers v. Atchison, T. & S. F. Ry. Co. and Booth v. New York Central R. Co., supra. Thus, even if the telegrams did state that J.A.W.D. Associates ordered the storage of the car, such evidence would not be determinative, since the defendant has clearly established that it did not surrender dominion over the car to J.A.W.D. Associates and that the order to put the car in storage came from an official of the delivering carrier. The delivering carrier exercised only such authority over the car of turkeys as it was lawfully authorized to do by the bill of lading. The plaintiff has failed to establish that any conversion of the car of turkeys took place.

A Mr. Jack Tankloff, the president of the J.A.W.D. Associates, represented that firm in connection with the transaction in question. Edward Ryan, freight agent for the delivering carrier at Pier 13, testified that in telephone conversations with Mr. Tankloff relating to the matter of the delivery of the car that Mr. Tankloff stated that he was in communication with the plaintiff relative to the disposition of the car. It is the claim of the defendant that that evidence is explanatory of the ambiguities in some of the communications of the delivering carrier to the plaintiff in relation to the car.

A vigorously controverted issue is whether the delivering carrier was under the duty to give the plaintiff notice of the non-delivery of the car in question. By "non-delivery" as used herein is meant the failure of the "notify party" to surrender the order bill of lading and accept the

458

shipment covered by the bill of lading. The bill of lading does not contain any provision requiring the delivering carrier to give notice of non-delivery. However, the United States Court of Appeals for the Eighth Circuit recently held that a carrier has a common law duty to exercise reasonable care with respect to perishables apart from the responsibility assumed in the express provisions of the applicable tariff or the bill of lading. See Watson Bros. Transp. Co., Inc., v. Feinberg Kosher Sausage Co., 8 Cir., 1951, 193 F.2d 283, affirming Feinberg Kosher Sausage Co. v. Watson Bros. Transp. Co., Inc., D.C.Minn. 1951, 101 F.Supp. 403. In that case the Court noted that the bill of lading covering the shipment preserved the carrier's common law duty. The bill of lading covering the shipment in question in the present case similarly preserves such duty. The courts are not in agreement as to the duty of a delivering carrier to give the consignor notice of non-delivery of a car where goods are shipped under a uniform order bill of lading naming the consignor as consignee. Some courts hold that in such a situation the delivering carrier is under no duty to give notice of non-delivery. Trinidad Bean & Elevator Co. v. Pennsylvania R. Co., D.C.Pa. 1933, 8 F. Supp. 888, affirmed 3 Cir., 1934, 72 F.2d 371. Other courts hold that in such a situation the delivering carrier is under a duty to give notice of non-delivery. Stoddard Lumber Co. v. Oregon-Washington R. & Nav. Co., 1917, 84 Or. 399, 165 P. 363, 4 A.L.R. 1275; Atlantic Coast Line R. Co. v. Ousley Co., 1927, 37 Ga.App. 215, 139 S.E. 586. See generally, Annotation 4 A. L.R. 1285, 1292; 9 Am.Jur., Carrier's, Sec. 575; 13 C.J.S., Carriers, § 178(b); Lust, The Law of Loss and Damage Claims, p. 169–174 (3d ed. 1931). Some courts take an intermediate position and hold that while there is no absolute duty on the part of the delivering carrier to give notice of non-delivery where the consignor is also the consignee, the circumstances in a particular case may be such as to give rise to that duty. Porter v. Pennsylvania R. Co., 1926, 217 App.Div. 49, 215 N.Y.S. 727. In

the case of Trinidad Bean & Elevator Co. v. Pennsylvania R. Co., 3 Cir., 1934, 72 F. 2d 371, the United States Court of Appeals makes clear the basis for the view the delivering carrier is not under a duty to give notice where the consignor is also the consignee. That court states, 72 F.2d at page 372:

"It will be noted that the bill of lading made Trinidad both consignor and consignee, and that under the decisions the naming of Marks as the 'notify party' did not make him a consignee. * * * It is contended by Trinidad that it should have been advised that the beans were not accepted by any one. Were such the law, we would have the strange contradiction in this case, where the consignor is itself the consignee of the goods, that the consignor should be advised that it, as consignee, had not accepted delivery."

See also, Hardin v. Chicago & A. Ry. Co., 1908, 134 Mo.App. 681, 114 S.W. 1117. In that case the time at which the consignor had notice of the refusal of a car by the "notify party" was material to the issue of the measure of damages for water damage to a car of oats. The Court held that the carrier did not need to give notice to the consignor of such refusal, on the theory that the "notify party" could be considered to be the agent of the consignor, and that the notice of arrival given to the "notify party" satisfied the carrier's duty with respect to notice.

It is the claim of the plaintiff that under common law the delivering carrier was under the duty to give notice of non-delivery. It further claims that the delivering carrier was under such duty by Freight Tariff Rules which were in effect under the Interstate Commerce Act. In that connection the plaintiff cites Rule No. 4, Sec. E.2.(a) of Supplement No. 137 to Freight Tariff No. 4–Y relating to Car Demurrage Rules and Charges. Rule No. 4, Section E.2.(a), reads as follows:

"2. (a) Except as otherwise provided in Note 1, when perishable carload freight has not been disposed of

by this railroad and remains on hand undelivered at the expiration of three (3) days (exclusive of Saturdays, Sundays and holidays (see Item No. 7 of tariff, as amended) ) from the first 7:00 A.M. after notice of arrival has been sent or given to the consignee or party entitled to receive same, a notice to that effect shall, within twenty-four (24) hours thereafter, be sent by wire to the consignor or owner when known, or when not known, to the agent at point of shipment, who shall promptly notify the consignor, if known."

The defendant claims that the provisions of that Supplement relate only to the matter of demurrage charges and violation thereof does not subject carriers to liability to shippers. In the case of Porter v. Pennsylvania R. Co., supra, the Court stated, 215 N.Y.S. at page 734, that provision for notice contained in a demurrage tariff was a recognition of the fact that a carrier might be under the duty to give notice under certain circumstances. The plaintiff further claims that the delivering carrier was under the duty to give notice of delivery under the following provisions of the Freight Claims Rules of the Freight Claim Division of the Association of American Railroads:

"Unclaimed or Undelivered Perishable Freight shall be reported within the time limits specified in bill of lading and/or applicable demurrage or storage tariff.

"Failure to comply with Rules 93 to 98, inclusive, shall render the carrier guilty of negligence in the event of payment of a claim by another carrier under legal liability or in the event of a deficit in charges (Rule 109). Failure to comply with the rules for reporting as specified in the demurrage and storage tariffs of member carriers which govern the application of storage and demurrage charges does not necessarily have the effect of imposing liability for loss of or damage to freight."

In the case of Epstein, Henning & Co. v. Nashville, C. & St. L. Ry. Co., 1926, 4 Tenn.App. 412, 420–422, it was held that such provisions did not give rise to liability to the shipper. The plaintiff also introduced evidence that it was the custom of carriers to give notice of non-delivery in situations similar to that in the present case. In the case of Emerson v. Chicago, B. & Q. R. Co., 1912, 120 Minn. 84, 138 N. W. 1026, it was held that the custom of carriers to give notice to the shipper in the event of non-acceptance by the "notify party" gave rise to liability on the part of the carrier where such notice was not given. The determinative decisions so far as this Court is concerned are the decisions of the United States Court of Appeals for the Eighth Circuit. In the case of Estherville Produce Co. v. Chicago, R. I. & P. R. Co., 8 Cir., 1932, 57 F.2d 50, 51, the Court had before it the situation where the consignor under a straight bill of lading was also the consignee of a car of poultry. The bill of lading contained the notation to "Spot at Levit & Woorman * * * Philadelphia". A draft with the bill of lading attached was sent to a bank at Philadelphia. Upon arrival the carrier spotted the car at the track usually used by Levit & Woorman. The carrier, acting under directions of Levit & Woorman, reconsigned it to Weehaukin, New Jersey. At that point Levit & Woorman procured the shipment without the payment of the draft and without surrender of the bill of lading. The carrier was held liable to the shipper for the value of the shipment. On page 56 of 57 F.2d of the opinion the Court states: "In this case the consignor was also named as consignee. * * * and to it, we think, immediate notice should have been given." It is not clear whether this statement as to the necessity of notice referred to the matter of diversion by Levit & Woorman or to the matter of the non-delivery of the car at the destination specified to the "notify party." The statement could be regarded as indicative that that Court is of the view that, where a carrier cannot make delivery of a car shipment to a "notify party" at the point of destination, such carrier is under the duty to give the consignor timely notice thereof. In some of the cases here-

tofore noted it was held that where the shipper was both the consignor and consignee under an order bill of lading containing a "notify" provision it would be assumed that the shipper would have actual knowledge of the delivery status of the car and for that reason notice of non-delivery need not be given by the carrier. Such assumption would only be realistic if the "notify party" was acting merely as agent for the shipper. If the "notify party" is a purchaser of the shipment and refuses to accept delivery, it would hardly be realistic to expect such defaulting purchaser to take action to protect the interest of the shipper such as by giving timely notice of non-delivery. In the present case the delivering carrier had actual knowledge that J.A.W.D. Associates was the apparent purchaser of the car of turkeys and that it was not accepting delivery.

In view of the case of Estherville Produce Co. v. Chicago, R. I. & P. R. Co., supra, it seems probable that the United States Court of Appeals for this Circuit is in accord with the rule which makes it the duty of a delivering carrier to give timely notice of non-delivery. If that case cannot properly be regarded as imposing such duty generally, it would seem that it could be regarded as authority for imposing such duty under certain circumstances. It was heretofore noted that there is authority to the effect that while there is no absolute duty to give notice, the circumstances as to a particular shipment may be such as to impose that duty. In a hearing before the Interstate Commerce Commission, In the Matter of Bills of Lading (1919) 52 I.C.C. 671, 717–721, it was indicated that it might make practical hardship to have a provision in the uniform bill of lading requiring the carrier to give notice of non-delivery in each and every case. The Commission stated on page 720:

"It is undoubtedly to the mutual interest of the carrier and shipper that such notices should be given, but we have no reason to believe that the carriers fail, in the general conduct of their business, to exercise due diligence and observe good business methods in respect to the giving of such notices."

■ It would seem that where the goods shipped are perishable in character and the market for such goods is variable and fluctuating that in the exercise of due diligence the delivering carrier should give the shipper timely notice of non-delivery. In the present case the turkeys were perishable in character and the market for them was variable and subject to fluctuation. It is the holding of the Court that under the circumstances in this case the delivering carrier was under the common law duty to give timely notice to the plaintiff of the non-delivery of the turkeys. The ground for this holding renders it unnecessary to consider the legal effect of the Demurrage Rules and the Freight Claims Rules of the Association of American Railroads on the matter of liability or to pass upon the sufficiency of the evidence as to custom.

The plaintiff stated of record that under the rules claimed by it to be applicable the delivering carrier had until 7:00 a.m. on Friday, December 23, 1949, to give the plaintiff notice of non-delivery. The defendant stated of record that if the delivering carrier was under the duty to give notice the time within which the notice should be given was as stated by the plaintiff. The defendant further stated of record that if it was under the duty to give notice that under the circumstances notice should have been by telegram.

■ It is well settled that a carrier is excused from giving notice of non-delivery where the consignor obtains timely notice from other sources. 13 C.J.S., Carriers, § 178(b). Where a shipper has actual knowledge of the non-delivery of a shipment the carrier is absolved from liability. Stoddard Lumber Co. v. Oregon-Washington R. & Nav. Co., 1917, 84 Or. 399, 165 P. 363, 4 A.L.R. 1275. The defendant claims that the plaintiff had timely notice from other sources as to the non-delivery of the turkeys. It is undisputed that the delivering carrier had until 7:00 a.m. on Friday, December 23, 1949, to give the

plaintiff notice. The defendant calls attention to the fact that on Saturday, December 24, 1949, the plaintiff wired the delivering carrier stating that the plaintiff was making claim against such carrier for failure to notify the plaintiff of non-delivery. The defendant claims that the telegram plainly reveals that the plaintiff on Saturday, December 24, 1949, already had actual knowledge of the non-delivery of the turkeys. The telegram would support the presumption that the plaintiff on December 24, 1949, knew of the non-delivery of the turkeys. However, ·the plaintiff's claim is ·based upon the breach of duty to give notice by 7:00 a. m. on December 23, 1949. Presumptions do not ordinarily relate backwards. State v. Mullen, 1911, 151 Iowa 392, 399, 131 N.W. 679, 682. The fact that it can be presumed that the plaintiff on December 24, 1949, had knowledge of that non-delivery would not warrant the presumption that the plaintiff had such knowledge on December 23, 1949. The plaintiff also refers to the testimony of Edward Ryan, the freight agent of the delivering carrier, at Pier 13, that on December 21, 1949, Mr. Tankloff of the J.A.W. D. Associates, in a telephone conversation, stated that he had talked with the plaintiff that morning and that the plaintiff had asked him to protect the lading, and to the testimony of that witness that after receipt by the delivering carrier of the telegram from the plaintiff dated December 24, 1949, Mr. Tankloff stated that he had been in touch with the plaintiff as to the car. There is no competent evidence that Mr. Tankloff was an agent or representative of the plaintiff. The statements testified to were hearsay and were not binding upon the plaintiff. The burden was upon the defendant to establish by a preponderance of the evidence that the delivering carrier was excused from giving notice. Stoddard Lumber Company v. Oregon-Washington R. & Nav. Co., 1917, 84 Or. 399, 165 P. 363, 4 A.L.R. 1275. The defendant has not met that burden. Thus, the situation is that the delivering carrier breached its duty by not notifying the plaintiff of the non-delivery of the turkeys by 7:00 a. m. on December 23, 1949. That, as heretofore noted, is the date of breach claimed by the plaintiff.

 The next issue is as to the matter of damages. The measure of damages where a carrier breaches its duty to give notice is the difference in the market value of the goods at the time the notice should have been given and at the time the notice was given. Stoddard Lumber Company v. Oregon-Washington R. & Nav. Co., 1917, 84 Or. 399, 165 P. 363, 4 A.L. R. 1275, 1283. The plaintiff concedes that on December 29, 1949, it was notified both by the delivering carrier and by the J.A.W. D. Associates of the non-delivery of the turkeys. The burden was upon the plaintiff first, to establish the market value of the turkeys at New York on December 23, 1949, and next to establish that their market value at New York on December 29, 1949, was lower than it was on December 23, 1949. December 23, 1949, was a Friday. December 24, 1949, was a Saturday. December 25, 1949, was a Sunday. Monday, December 26, 1949, was observed as the Christmas holiday in the New York City area. It is the claim of the plaintiff that because of the failure of the delivering carrier to give it notice of non-delivery it was deprived of the opportunity of selling the turkeys for the Christmas trade. It is the claim of the plaintiff that if it had been given such notice it could have sold the turkeys for the Christmas trade for the sum of $11,144.97. Since the date of breach as to notice was December 23, 1949, the claim of the plaintiff is in substance that on December 23, 1949, the market value of the turkeys in question on the New York market was $11,144.97. The plaintiff's evidence as to the value of the turkeys on that day related only to market value. The president of the plaintiff testified that the three other cars of poultry shipped about the same time as the car in question were sold to the J.A.W.D. Associates at "market." The plaintiff offered no evidence as to the time or times when those three cars were sold or as to the prices at which they were sold. The plaintiff's proof of market value consisted of

462

market information contained in a paper known as The Producers' Price-Current. That paper was a trade paper containing market quotations and other information as to the poultry market in New York City. It was conceded by the defendant that the paper was of general circulation and use among those engaged in trading in poultry. It appears that the turkeys in question were of a type known to the trade as Northwestern dry packed turkeys. In the issues of December 16, 19, and 20, 1949, the paper reported that the market for turkeys on those days was quiet and weak and in the buyers' favor, particularly for frozen turkeys. In the issue of the paper of December 21, 1949, appears the following:

"The market for turkeys has turned more or less sour and every effort now is being made to sell as much stock as possible. Call is only for fresh soft stock and frozen has no outlet and no settled value. The proposition boils down apparently to the simple fact that there have been too many turkeys available and buying has not been up to expectations."

In the issue of the paper of December 22, 1949, appears the following:

"The market for turkeys is in a semi-demoralized condition with extreme pressure to sell and surplus goods piling into freezers. Up to this writing the retail demand has been most disappointing and from reports at hand that would seem to be the case at almost all other points throughout the United States. There was a little picking-away in spots for last minute needs but as a whole the market was pretty well dead. Concessions, of course, are the order of the day and it is extremely difficult to report accurately going values in any table of quotations. We have reduced our figures all along the line to more nearly cover the situation but sales are at all sorts of prices and our outside quotations must be considered very extreme throughout."

In the issue of the paper of December 23, 1949, appears the following:

"Market for turkeys almost at a complete standstill today and it is difficult to determine anything like values on the basis of the extremely limited business reported. However, goods were offering irregularly at still lower prices and we reduce our quotations accordingly, as a matter of fact, our outside quotations all along the lines must be considered extreme."

A Mr. Marcy Fox testified in behalf of the defendant. He had been associated with the purchase and sale of poultry in the New York market for around thirty years. He was closely in touch with, well informed as to, and thoroughly familiar with the market conditions as to turkeys in the New York market during the period of time here material. He testified that when sufficient fresh turkeys are available, the buyers will buy such turkeys in preference to frozen turkeys and that during the week of December 16 to December 24, 1949, plenty of fresh turkeys were available and that frozen turkeys were so difficult to sell that many of those having frozen turkeys to sell were putting them in storage. In response to the question as to whether the turkeys in question could have been sold for more than $8,397.23 during the week of December 16 to December 24, 1949, he testified that the turkeys in question, being frozen turkeys, could not be sold during that period except at demoralized prices. He testified, in substance, that the market quotations given in The Producers' Price-Current for frozen turkeys during that period were "paper" prices. The Producers' Price-Current, in its commentaries on the market heretofore set out, was in accord with that testimony. The situation was that on December 22, 1949, the turkey market was in a semi-demoralized condition and on December 23, 1949, was almost at a complete standstill. The plaintiff's claim of a New York market value for the turkeys in the sum of $11,-144.97 is based upon the "paper" quotations appearing in The Producers' Price-Current. It clearly appears that the mar-

ket value assigned by the plaintiff to the turkeys in question on the New York market on December 23, 1949, is fictitious, unreal, and unsupported by the evidence. It is clear that the plaintiff could not have sold the turkeys on that day except at a demoralized price. What that price might have been does not appear, as the plaintiff offered no proof of market value on that day other than the "paper" quotations given in The Producers' Price-Current. Where a party seeks to recover damages based upon a claimed market value of a commodity at a certain market at a certain time the burden is upon such party to establish that it was reasonably likely that the commodity could have been sold at the claimed market price, or, if the commodity could not have been sold at the claimed market price, the approximate price at which the commodity could have been sold. Cf., Annotation, 20 A.L.R.2d 819. The plaintiff in this case has failed to establish that it was reasonably likely that the turkeys in question could have been sold at the claimed market price at New York on December 23, 1949. There is no evidence in this case from which the trier of fact can even make an approximation as to the price at which the turkeys in question might have sold on that day. In this case in order to establish a claim for damages the burden was upon the plaintiff to establish by the preponderance of the evidence that it could have sold the turkeys in question for more on December 23, 1949, than it could have sold them for on December 29, 1949. The plaintiff has failed to so establish.

The plaintiff also makes claim for the sum of $304.28 for storage charges on the turkeys. It was heretofore noted that under the bill of lading for the turkeys the delivering carrier had the lawful right to put the turkeys in storage at the time it put them into storage. The bill of lading further provides that such storage shall be at the cost of the owner. The plaintiff cannot recover for that item.

Judgment will be entered in favor of the defendant.